CHANCELLOR MANOR, Gateway Investors, LTD., and Oak Grove Towers Associates, Plaintiffs–Appellants,

v.

UNITED STATES, Defendant–Appellee.

No. 02–5066.

United States Court of Appeals, Federal Circuit.

June 12, 2003.

GAJARSA, Circuit Judge.

This is a regulatory takings case wherein the Plaintiffs allege that the United States's enactment of legislation relating to low-income housing programs breached contracts between the Plaintiffs and the United States and effected a regulatory taking of property protected under the Fifth Amendment. Plaintiffs–Appellants, Chancellor Manor ("Chancellor Manor"), Gateway Investors, Ltd. ("Gateway Investors"), and Oak Grove Towers Associates ("Oak Grove") (collectively "Appellants" or "Owners"), appeal the November 30, 2001 final judgment of the United States Court of Federal Claims granting summary judgment to the United States on Appellants' breach of contract and takings claims. *Chancellor Manor v. United States,* 51 Fed. Cl. 137 (2001). Because the Court of Federal Claims correctly granted summary judgment with respect to Appellants' breach of contract claims but incorrectly determined that Appellants did not possess protectible real property interests and thus presented no compensable takings claims, we affirm-in-part, reverse-in-part, and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

Appellants are the owners of various multifamily rental housing projects in Minnesota. The housing projects were developed and financed pursuant to Section 221(d)(3) and Section 236 of the National Housing Act ("NHA") through a three-party arrangement including the Owners, the Department of Housing and Urban Development ("HUD"), and private lenders. The Section 221(d)(3) and Section 236 programs ("the programs") were designed by Congress primarily to encourage creation of low-income housing. Generally, in exchange for an agreement by property

Jeff H. Eckland, Faegre & Benson LLP, of Minneapolis, Minnesota, argued for plaintiffs-appellants. With him on the brief were William L. Roberts and Mark J. Blando.

John E. Kosloske, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. On the brief were David M. Cohen, Director, and Mark L. Josephs, Senior Trial Counsel.

Before SCHALL, GAJARSA, and DYK, Circuit Judges.

Owners to maintain particular properties as low-income housing properties (subject to federal regulations), the United States granted various tax benefits and committed to insuring the mortgages of the Owners. Prior to 1968, this mortgage insurance enabled the Owners to obtain below-market rate mortgages (Section 221(d)(3)). After 1968, the NHA was amended to enable Owners to obtain a market-rate mortgage with an interest rate subsidy from the United States and enabled the lenders to issue long-term mortgages amortizable over a forty-year period (Section 236). In addition, as Appellants contend, another incentive was the option to prepay the mortgages, without HUD approval, at the end of a twenty-year term and thus eliminate the restrictions on the property imposed by federal regulation. These changes to the federal regulations, including the elimination of the twenty-year prepayment option, are the subject of the present, and other, litigation.[1]

The three-party transaction was essentially a government-subsidized real estate development deal between the Owners and the lenders. The United States's role in the transaction was to act as an insurer for the Owners in the event of default of the Owners' mortgage commitments. In exchange for the United States's commitment, the Owners agreed to various restrictions on the use of the properties in the programs. These obligations included: (1) constructing and maintaining housing in accordance with HUD specifications; (2) renting only to HUD-approved low- and moderate-income tenants; (3) charging only HUD-approved rents; (4) maintaining cash reserves to self-insure against default; and (5) limiting return on investment to no more than an annual return of six percent on initial investment.

The three parties to this complicated transaction made various commitments to each other, evidenced by the execution of at least five separate independent agreements, including a Mortgage Note ("Note") and a Mortgage between the Owners and the lenders; a Regulatory Agreement and a Mortgagor's Certificate between the Owners and HUD; and a Commitment for Insurance Advances ("Insurance Commitment") between the lenders and HUD.[2] None of the agreements included any cross-referencing clause integrating the agreements as a single transaction or making the United States, the Owners, and the lenders parties to each separate agreement.

The Mortgage and Note issued by the Owners to the lenders were the documents that evidenced the funding for the programs. The Note outlined the terms and conditions of the repayment from the borrower-owner to the lender and was payable over a forty-year period with an option to prepay the Note, without HUD approval, after twenty years. HUD endorsed the Note as part of its insurance

---

**1.** Other similarly situated business entities filed lawsuits stating similar causes of action. In particular, Cienega Gardens, et al. have actions currently pending and previously decided that are germane to the issues in this appeal. *See Cienega Gardens v. United States*, 194 F.3d 1231 (Fed.Cir.1998), *cert. denied*, 528 U.S. 820, 120 S.Ct. 62, 145 L.Ed.2d 54 (1999) (*"Cienega IV"*) (dismissing claims for breach of contract for lack of jurisdiction because Cienega Gardens, et al. were not in privity of contract with the United States with regard to the prepayment option); *Cienega Gardens v. United States*, No. 02–505, 331 F.3d 1319 (Fed. Cir. June 12, 2002) (*"Cienega VIII"*).

**2.** The documents the Appellants, HUD, and the lenders executed in this transaction are the same documents in form and substance as the documents discussed in *Cienega IV*. The only difference is that *Cienega IV* did not explicitly discuss the Mortgagor's Certificate.

commitment but was not otherwise a party to the Note. The Mortgage on the subject properties secured payment of the Note.

The Insurance Commitment between HUD and the lenders memorialized HUD's agreement to provide an insurance endorsement for the Owners-mortgagors' Notes. The Mortgagor's Certificate between the Owners and HUD referenced this agreement between HUD and the private lenders regarding HUD's insurance endorsement of the Owners' Notes. The Mortgagor's Certificate stated that the Owner "agrees to accept a loan insured by you [HUD] upon the terms set forth in your Commitment...."

The Regulatory Agreement between HUD and the Owners memorialized the Owners' agreement to the "affordability restrictions," including restrictions on the income levels of tenants, allowable rental rates, and the rate of return on investment the Owners could receive from the project discussed above.

The only document that explicitly references the twenty-year prepayment option is the Note. The prepayment option in the Note reflected the contemporaneous HUD regulations, see 24 C.F.R. §§ 221.524(a)(ii), 236.30(a)(1)(i) (1970), governing the Section 221(d)(3) and Section 236 programs. Cienega IV, 194 F.3d at 1235. The relevant sections of the regulations provided that:

> A mortgage indebtedness may be prepaid in full and [HUD's] controls terminated without prior consent of HUD ... (i) If the prepayment occurs after the expiration of 20 years from the date of the final insurance endorsement of the mortgage....

24 C.F.R. § 236.30(a)(1)(i) and (ii).

The regulations also stated that:

The regulations in this subpart *may be amended by [HUD] at any time and from time to time, in whole or in part, but such amendments shall not adversely affect the interests of a mortgagee or lender* under the contract of insurance on any mortgage or loan already insured and shall not adversely affect the interests of a mortgagee or lender on any mortgage or loan to be insured on which [HUD] has made a commitment to insure.

24 C.F.R. § 236.249 (1970) (emphasis added).

By prepaying the balance of the outstanding loan represented by the Note, an Owner could terminate HUD's affordability restrictions imposed on the property and convert the property into a conventional rental property, thereby charging market rental rates and increasing the Owners' return on investment to a free-market rate of return. Cienega IV, 194 F.3d at 1235.

In the late 1980s, the United States became concerned that a large number of Owners participating in the programs might exercise their prepayment option, creating a shortage in the supply of low-income housing and injuring existing tenants. Id. Consequently, in 1988, Congress enacted the Emergency Low–Income Housing Preservation Act ("ELIHPA"). ELIHPA placed a two-year moratorium on mortgage prepayments to allow Congress time to devise a permanent solution to the potential shortage of low-income housing. Id.

In 1990, ELIHPA was replaced by the Low–Income Housing Preservation and Resident Homeownership Act ("LIHPRHA"). LIHPRHA made permanent the moratorium on prepayment and authorized HUD to provide additional incentives to Owners in exchange for remaining in the programs, including, inter alia: (1) increased access to residual receipts accounts; (2) increased rents; (3) additional

financing for capital improvements; and (4) the ability to draw funds from the project by accessing a portion of the equity in the housing project through a second mortgage, insured by HUD. 12 U.S.C. § 4109 (Supp. II 1990). A key aspect of LIHPRHA required HUD approval for any election to prepay a mortgage. *Id.* LIHPRHA included a number of criteria required for HUD approval, including written findings by HUD that prepayment would not: (1) materially increase economic hardship for current tenants; (2) result in a monthly rental payment that exceeds percentages set by statute; (3) involuntarily displace current tenants without good cause; or (4) diminish the supply of low-income housing that would be sufficient for the needs of the community. 12 U.S.C. § 4108(a) (Supp. II 1990).

In 1996, Congress enacted the Housing Opportunity Program Extension Act ("HOPE"). HOPE restored the prepayment rights to Owners, without HUD approval, provided the Owners agreed not to raise rents for a period of sixty days after the prepayment of any unpaid balance of the Notes. *Id.*

By accepting a government-insured loan pursuant to the Section 221 or Section 226 program, each Owner was required to agree to the numerous regulatory restrictions discussed above. The twenty-year prepayment option period began at different times for the various participants in the programs. For example, Chancellor's twenty-year option period began on August 14, 1993; Oak Grove's twenty-year option period began on January 31, 1994; and Gateway Investors's twenty-year option period began on June 6, 1995. Thus, at the time when the parties' respective twenty-year prepayment options began, all

three parties were prevented from prepayment by LIHPRHA.

Pursuant to the regulations promulgated under LIHPRHA, the Appellants notified HUD requesting permission to prepay their remaining debt under the twenty-year provisions in each of their Notes. Each Appellant was advised at various times in 1993 that they would not meet the criteria for prepayment under LIHPRHA, would not be permitted to prepay the Mortgage, and could only leave the programs by selling the property to a non-profit organization approved by HUD. *Chancellor Manor,* 51 Fed. Cl. at 146–47. Consequently, all three Owners filed with HUD an Initial Notice of Intent to Terminate or Extend Low–Income Affordability Restrictions, electing to extend the low-income affordability restrictions by requesting additional incentives pursuant to 12 U.S.C. § 4109. Specifically, in exchange for extending the HUD restrictions for an additional fifty years, all three Owners elected to obtain a second insured mortgage on their properties up to an amount equal to their equity in the properties. *Id.* at 147–48. This second insured mortgage allowed the Owners to withdraw their appreciated equity from the projects.

Election to receive the additional insured loan also required the execution of an Amendment of Existing Regulatory Agreement. *Id.* at 147. This document was voluntarily executed by Chancellor Manor on February 14, 1995, before enactment of HOPE.[3] Despite their expressed intentions, Gateway Investors and Oak Grove did not execute the Amendment of Existing Regulatory Agreement prior to the enactment of HOPE. *Id.* Thus, only Chancellor Manor's election became legally binding before enactment of HOPE. *Id.*

---

**3.** Chancellor Manor's voluntary election may constitute a waiver of its right to challenge the effects of LIHPRHA; however, this issue was not addressed by the Court of Federal Claims or parties and we therefore do not consider it here.

Accordingly, Chancellor Manor is the only Owner remaining in HUD's Section 236 program. Pursuant to HOPE, Oak Grove and Gateway Investors prepaid their notes in 1997 and withdrew from the regulatory restrictions imposed by HUD. Oak Grove and Gateway Investors increased their rents to market levels in October 1997. *Id.* at 148.

All three Owners filed a complaint at the Court of Federal Claims on January 20, 1998, alleging that the LIHPRHA legislation enacted in 1990:(1) anticipatorily repudiated their contractual rights to prepay their mortgages after twenty years without HUD approval; and (2) resulted in a taking of the subject properties for public use without just compensation. *Id.*

On February 10, 1998, the United States filed an unopposed motion to stay the proceedings pending resolution of Cienega IV. *Chancellor Manor,* 51 Fed. Cl. at 148. *Cienega IV* was decided on December 7, 1998, and the stay was lifted in June 1999. *Id.* In *Cienega IV,* this court dismissed Cienega Gardens, et al.'s breach of contract claims for lack of jurisdiction because Cienega Gardens, et al. were not in privity of contract with the United States with regard to the prepayment option. *Cienega IV,* 194 F.3d 1231.

Once the stay was lifted, the Owners argued that, notwithstanding this court's decision in *Cienega IV,* they were entitled to relief based on three distinct theories of contract liability that were not addressed by *Cienega IV:* (1) a contract was formed between each Owner and the government by virtue of HUD's offer, i.e., the Commitment for Insurance of Advances, and each Owner's acceptance of this offer, i.e., the Mortgagor's Certificate; (2) each Owner was an intended third-party beneficiary of the contracts executed between HUD and the lenders; and (3) the United States is judicially estopped from denying privity of contract between the Owners and the United States based on previously asserted, prevailing arguments in *United States v. David,* No. 94–7191, 1995 WL 57502, 1995 U.S. Dist. LEXIS 1630, at *1 (E.D.Pa. Feb. 9, 1995).

With respect to the takings claims, the Owners argued they had protectible real property interests in their housing projects—entitling them to the economically productive use and enjoyment of the properties, exclusive possession, and other common real property rights—and that LIHPRHA effected a taking of these property rights without just compensation. The Owners also argued that LIHPRHA effected a Fifth Amendment regulatory taking of contract rights to prepay the mortgages after twenty years.[4]

The United States moved for summary judgment on January 4, 2001, arguing that the Owners' contract claims must be dismissed based on this court's decision in *Cienega IV* and that the Owners did not possess any property or contract rights that could be taken by the United States. *Chancellor Manor,* 51 Fed. Cl. 137.

The Court of Federal Claims granted the United States's summary judgment motion with regards to the breach of contract claims, holding that (1) in light of *Cienega IV,* the Owners were not in privity of contract with the United States with regard to the prepayment option, regardless of the presence of the Mortgagor's Certificate; (2) the Owners were not third-party beneficiaries to the Insurance Commitment; and (3) the United States was not judicially estopped from arguing lack

---

4. Appellants, in their briefs and at oral argument, limited their regulatory takings arguments to the taking of a protected interest in real property. Appellants adopted the arguments relating to the taking of contract rights pending the outcome of *Cienega VI.*

of privity, citing this court's characterization of *David* in *Greenbrier v. United States*, 193 F.3d 1348 (Fed.Cir.1999). *Chancellor Manor*, 51 Fed. Cl. 137.

The Court of Federal Claims also granted the United States's summary judgment motion with regard to the takings claims, holding that:

> The fundamental flaw in the plaintiffs' argument ... is the premise that the owners were entitled to unfettered control of their housing projects after the 20–year anniversary dates of their mortgage note endorsements by HUD.... [F]ederal regulations in effect during the 1970s did allow owners in the NHA's section 236 program to prepay their mortgage notes after 20 years without HUD approval. The prepayment terms in the mortgage notes tracked these regulations. However, as the Federal Circuit found in *Cienega Gardens*, 194 F.3d at 1244, the regulations [24 C.F.R. § 236.249] expressly stated that they were subject to amendment by HUD "at any time." Thus, when [plaintiffs] entered into the section 236 program they knew, or should, have known, that the regulations governing the prepayment of their mortgage notes could be changed in a manner that might restrict the owners' option to prepay after 20 years.... In other words, the plaintiffs' expectations (or hopes) of converting their projects to conventional, market-rate rental properties after 20 years did not inhere in their ownership of the properties. When LIHPRHA was enacted, therefore, the plaintiffs did not even hold the state law property rights they are claiming, and the prepayment prohibition could hardly effect a taking of property

rights which the plaintiffs did not possess.

51 Fed. Cl. at 158.

The Owners timely appealed the Court of Federal Claims's decision and we have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

■ We review the Court of Federal Claims's grant of summary judgment *de novo*. *Berkley v. United States*, 287 F.3d 1076, 1083 (Fed.Cir.2002). "Whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings." *Bass Enters. Prod. Co. v. United States*, 133 F.3d 893, 895 (Fed.Cir.1998) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

On appeal, Appellants advance two distinct legal theories—one premised upon contract law, the other premised upon regulatory takings law.[5]

### A. Contract

■ As an initial matter, to succeed under either theory, Appellants must prove that the United States waived its sovereign immunity, for "[t]he United States, as sovereign, is immune from suit save as it consents to be sued." *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941). Waivers of sovereign immunity are construed narrowly. *United States v. Nordic Vill., Inc.*, 503 U.S. 30, 34, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). The United States has waived immunity from suit under the Tucker Act in actions brought in the Court of Federal Claims "founded either upon

---

5. Appellants did not appeal the Court of Federal Claims's determination concerning the issue of judicial estoppel.

the Constitution, or any act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages not sounding in tort." 28 U.S.C. § 1491(a)(1) (2000). The Court of Federal Claims thus has jurisdiction over claims based on "any express or implied contract with the United States." *Id.*

This court has consistently held that for the government to be sued on a contract pursuant to the Tucker Act, there must be privity of contract between the plaintiff and the United States. *See, e.g., Cienega IV,* 194 F.3d at 1239 ("The effect of finding privity of contract between a party and the United States is to find a waiver of sovereign immunity."); *Katz v. Cisneros,* 16 F.3d 1204, 1210 (Fed.Cir.1994) ("Absent privity between [plaintiffs] and the government, there is no case.").

In an attempt to establish privity of contract, and thus a waiver of sovereign immunity, Appellants allege two distinct errors as to the Court of Federal Claims's decision on their breach of contract claims. First, Appellants argue that the Insurance Commitment was a legally binding offer that was accepted by the Appellants' execution of a Mortgagor's Certificate. Second, Appellants contend they were intended third-party beneficiaries of the contracts between HUD and the lenders.

### 1. *Mortgagor's Certificate*

■ The specific question before us is whether the agreements framed by the Insurance Commitment and the Mortgagor's Certificate (each of which was in a form approved by HUD) gave rise to privity of contract between HUD and the Owners with respect to the prepayment terms.

This court, in *Cienega IV,* stated that "in order to find privity of contract, we must find on the part of HUD 'the type of direct, unavoidable contractual liability that is necessary to trigger a waiver of sovereign immunity, the inevitable result of finding privity of contract.'" *Cienega IV,* 194 F.3d at 1241 (quoting *Nat'l Leased Hous. Ass'n v. United States,* 105 F.3d 1423, 1426 (Fed.Cir.1997)). Applying this standard to a virtually identical set of facts and agreements, this court, in *Cienega IV,* determined it necessary to "start from the premise that the United States, i.e., HUD, was a named party to only one contract in connection with each of the relevant projects, that contract being the regulatory agreement." 194 F.3d at 1241–42. The Regulatory Agreement did not incorporate by reference any other agreement, including the Note containing the prepayment terms. *Id.* at 1242. "Although HUD did provide its insurance endorsement, it was not expressly made a party to any [Note]." *Id.* The court went on to state that while the Note and the Regulatory Agreement were part of the same transaction, "each document stands alone and is unambiguous on its face." *Id.* at 1243. This court determined privity of contract did not exist, because none of the relevant documents in those transactions expressly contained the prepayment terms or listed HUD and the Owners as parties.

The "new theory" asserted by Appellants in this case does not change this analysis. The only "new" document that Appellants allege, in combination with the Insurance Commitment, creates privity of contract is the Mortgagor's Certificate. The Mortgagor's Certificate also does not contain any reference to terms regarding prepayment. Thus, under this court's holding in *Cienega IV,* Appellants' privity of contract theory based on the Insurance Commitment and the Mortgagor's Certificate fails. As the Court of Federal Claims stated in its decision:

It is true that the Federal Circuit did not address the Mortgagor's Certificate in its opinion. Considering the nature and substance of the HUD Commitment, however, it is clear that bringing the Mortgagor's Certificate into the analysis could no more establish prepayment privity between HUD and the plaintiffs than the HUD Commitment could standing alone. The HUD Commitment and Mortgagor's Certificate established a contract of mortgage insurance between HUD and each of the plaintiffs. There is no language in either of those documents, however, that refers to prepayment rights in connection with the mortgage notes, which the Federal Circuit found to be separate contracts between the Owners and lenders.

*Chancellor Manor*, 51 Fed. Cl. at 152.

The Mortgagor's Certificate authorizes and provides the representations made by the Owners in accepting the loan insured by the United States. The Owners certified they had the necessary power and authority to develop the project. This is a typical officer's certificate and is a standard document obtained in virtually any financial transaction wherein the officer of the borrower affirms the possession of authority to proceed with the project and that the borrower shall abide by the representations and certification made in order to induce the United States to insure the loan. The Mortgagor's Certificate contains no prepayment provisions and therefore does not create privity of contract between HUD and the Owners with respect to the prepayment terms. Accordingly, the Court of Federal Claims correctly addressed and decided this particular issue in its decision.

Appellants also argue that the Insurance Commitment and the Mortgagor's Certificate together create a contract between HUD and Appellants for mortgage insurance and incorporate by reference all the relevant regulations, including the prepayment terms, thereby creating privity of contract for the prepayment terms. In particular, Appellants point to language in the Insurance Commitment that states that HUD:

> will endorse for insurance *under the provisions of Section 236 of the National Housing Act, and the regulations thereunder now in effect,* a mortgage note ... to be secured by a mortgage.... The insurance endorsement will be *subject to compliance with the requirements of the Regulations,* and the terms and conditions set forth below.

(emphases added).

There are two flaws in this argument. First, the Insurance Commitment is an agreement between HUD and the lenders. Despite Appellants' arguments, it does not incorporate by reference the prepayment regulations and therefore there is no privity of contract between the Appellants and HUD with respect to the prepayment option. *Greenbrier*, 193 F.3d at 1355 (holding that the various agreements between HUD and the owners did not incorporate the prepayment provisions by reference). Second, as stated by this court in *Cienega IV*, the very regulations now asserted to be incorporated by reference contain an express provision that the regulations may be amended by HUD at any time:

> [I]t would have been inconsistent for HUD to have entered into the regulatory agreement if the agreement fixed the prepayment rights of the Owners, in view of the express power to amend the Section 221(d)(3) and Section 236 program regulations at any time that was reserved to HUD, subject only to the caveat that mortgagees' interests not be adversely affected.

194 F.3d at 1244. For these reasons, Appellants' incorporation by reference argument fails.

In short, there is simply no evidence that the United States was a party to any agreement containing the prepayment terms. Absent privity of contract, there is no waiver of sovereign immunity. *Katz,* 16 F.3d at 1210.

#### 2. *Third–Party Beneficiary*

 Appellants also argue that they are third-party beneficiaries to the agreements between HUD and the lenders. While Appellants could establish privity of contract if they are intended third-party beneficiaries of a contract with the United States, *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999), in order to prove third-party beneficiary status, Appellants must demonstrate that the contract not only reflects an express or implied intention to benefit the party, but that it reflects an intent to benefit the party directly, *Castle v. United States,* 301 F.3d 1328, 1338 (Fed.Cir.2002), *petition for cert. filed* Dec. 16, 2002. This direct benefit requirement reflects the reality that third-party beneficiary status is an "exceptional privilege." *See Glass v. United States,* 258 F.3d 1349, 1354 (Fed.Cir.2001), *amended on reh'g,* 273 F.3d 1072 (Fed.Cir.2001) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912)).

None of the alleged agreements between the lenders and HUD contains any explicit evidence showing that HUD or the lenders intended to benefit the Owners directly. Appellants contend they were the direct intended third-party beneficiaries by virtue of the Insurance Commitment between HUD and the lenders because without Appellants there would be no other reason for HUD's agreement to insure each Owner's repayment of the loan. At best, this shows that Appellants were indirect beneficiaries of the Insurance Commitment. The primary, direct beneficiary of the Insurance Commitment was the public. *See Katz,* 16 F.3d at 1210 ("If there is a third party beneficiary at all, it is probably the low-income tenants for whom the housing was ultimately intended."). Appellants have not pointed to any persuasive evidence showing they were *direct* intended beneficiaries of the Insurance Commitment. Accordingly, we hold that Appellants were not third-party beneficiaries of the Insurance Commitment between HUD and the lenders.[6]

### B. *Regulatory Takings*

 Appellants also appeal the Court of Federal Claims's decision denying their claims that LIHPRHA effected a taking of a protectible property interest in their land and their contracts without just compensation.

 The Fifth Amendment provides, in relevant part, "nor shall private property be taken for public use, without just compensation." U.S. Const. amend. V. Analysis of a regulatory taking claim involves a "two-tiered" inquiry into the government act alleged to have constituted a taking. *M & J Coal Co. v. United States,* 47 F.3d 1148, 1153–54 (Fed.Cir.1995). First, a court considers the nature of the interest allegedly taken to determine whether a compensable property interest exists. *Id.* at 1154. It is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation.

---

**6.** Notwithstanding this determination, Appellants' argument fails because the Insurance Commitment still lacks the prepayment terms this court determined to be so critical in *Cienega IV.*

*Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed.Cir.2001).

■ Second, the court determines whether the interest allegedly taken constitutes a compensable taking of that interest for a public purpose. *M & J Coal*, 47 F.3d at 1153–54; *Fla. Rock Indus., Inc. v. United States*, 18 F.3d 1560 (Fed.Cir. 1994). In the context of an alleged taking via regulation, as we have here, our analysis centers on the factors identified by the Supreme Court in its seminal decision, *Penn Central:*

> The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations. So, too, is the character of the governmental action.

438 U.S. at 124, 98 S.Ct. 2646. This court has interpreted the *Penn Central* factors as requiring

> that the court balance several pragmatic considerations in making its regulatory takings determination. These considerations include: the economic impact of the regulation on the claimant, the extent to which the regulation interferes with the investment-backed expectations, and the character of the Government action.

*Fla. Rock*, 18 F.3d at 1564 (applying the *Penn Central* analysis to determine whether the denial of a permit to mine limestone on the owner's property was a compensable taking).

### 1. Protected Property Interest

Appellants advance two separate property interests they believe are protected by the Fifth Amendment, one based in their real property rights and the other based on contract. We address each in turn.

■ Property within the Fifth Amendment denotes "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 89 L.Ed. 311 (1945). The Fifth Amendment clearly protects interests in real property, such as the Owners' interests in the land and buildings. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1016 n. 7, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (stating that a fee simple interest in real property is an estate with a rich tradition of protection at common law). Courts have long recognized that property owners have the right to exclusive possession. Indeed, the Supreme Court has stated that the right to exclusive possession is "one of the most essential sticks in the bundle of rights commonly characterized as property." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979). An interest in real property is defined not only by the metes and bounds that describe the geographic dimensions of the property but also by the term of years that describes the temporal aspect of the Owner's interest. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 331–32, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). Both dimensions must be considered if the interest is to be viewed in its entirety. *Id.*

In the present case, the general partners of the Owners purchased the land on which the housing was built before the Owners participated in the programs. With their participation in the programs, the Owners voluntarily contracted away, for a limited temporal period, their right to exclusive possession. In particular, the Owners agreed to remain in the programs for a minimum period of at least twenty years. At the time the Owners entered into the programs, they had the right to exit the programs by prepaying their

mortgages upon expiration of a twenty-year period. Thus, the Owners possessed a protectible real property interest with a limited temporal "moratorium" on the unfettered use of their property and right to exclusive possession.

The enactment of ELIHPA and LIHPRHA imposed additional restrictions on the Owners' *real property* interest, e.g., prohibiting prepayment absent HUD approval based on stringent requirements, which were not in existence when the Owners entered the programs. In other words, ELIHPA and LIHPRHA essentially extended, in revised form, the limited temporal moratorium on the Owners' right to unfettered use of their property. The property interest which is identifiable and recognized is the Owners' real property interest in the projects, i.e., the land and the buildings. The Owners entered into the programs and subjected their real property interests to a regulatory scheme, which allowed them to develop the projects. The Owners agreed to be subject to a temporal moratorium on their right to exclusive possession; however, LIHPRHA imposed an additional and continued limitation on the Owners' ability to unfettered use of the property. The issue to be determined is whether this resulted in a compensable taking of a property interest protected by the Fifth Amendment. *See id.* at 321, 122 S.Ct. 1465 (stating that a five-year moratorium on development of land while a commission studied the effects of development on Lake Tahoe was better characterized as a regulatory taking rather than a categorical taking). The Court of Federal Claims determined the Appellants held no protectible property interest because they "knew, or should have known, that the regulations governing the prepayment of their mortgage notes could be changed in a manner that might restrict the Owners' option to prepay after 20 years." We disagree with this analysis because it does not take into account the limited use imposed upon the real property of the Owners by the amended regulations. Whether the Appellants knew or should have known that the regulations could be changed is more properly an issue germane to the *Penn Centra 1* analysis, not to whether the Appellants possessed a protected property right. *See Lucas,* 505 U.S. at 1016 n. 7, 112 S.Ct. 2886. Because the Court of Federal Claims erred in determining that Appellants did not hold a protected real property interest, we reverse the Court of Federal Claims's grant of summary judgment with respect to Appellants' takings claims.

Additionally, Appellants also argue that ELIHPA and LIHPRHA effected a compensable taking of a protected contractual right, i.e., the option to prepay after twenty years, as presented in *Cienega VI.* That option right, however, is not really the issue here, except insofar as it is a trigger for exiting the federal housing program. Appellants complain about the continued restrictions on the use of their property, not their inability to prepay the mortgage and the concomitant obligation to pay the rate of interest fixed in the mortgage instrument.

The only value this right provided Appellants was the ability to terminate the regulatory restrictions imposed on Appellants' real property. Appellants simply do not allege a contractual right separate and distinct from the real property right discussed above. For the foregoing reasons, we hold that the "contract" right Appellants assert was taken is, in fact, a right grounded in real property, and not in contract.

2. *Penn Central Analysis*

Having determined Appellants possessed a protected property right in

their real property, the second step of a proper takings analysis requires an analysis of the *Penn Central* factors. This analysis is a question of law based on factual underpinnings, *Bass Enters. Prod.*, 133 F.3d at 895, and involves "a complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). While this analysis is essentially an *ad hoc*, factual inquiry, *id.* at 633, 121 S.Ct. 2448; *Penn Central*, 438 U.S. at 124, 98 S.Ct. 2646, it is nonetheless an *objective* one. *See Palazzolo*, 533 U.S. at 629–30, 121 S.Ct. 2448 ("The determination whether an existing, general law can limit all economic use of property must turn on objective factors...."); *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed.Cir.2001) (*en banc*) (applying *Penn Central* analysis to issue of whether Congress's change in regulations was retroactive and in violation of the Due Process Clause of the Constitution). The subjective expectations of the Appellants are irrelevant. *Id.* The critical question is what a reasonable owner in the Appellants' position should have anticipated. *Id.* The point in time when the analysis is conducted is the time at which the complaining party entered into the activity that triggered the obligation, *id.* at 1350, specifically when the Appellants entered the programs.

The Court of Federal Claims in this case determined that no protected property interest exists; hence the Court of Federal Claims made no factual findings and conducted no *Penn Central* analysis. The government nonetheless argues that we should hold as a matter of law that there has been no taking because the Owners could not have had reasonable expecta-tions. It advances three arguments for this proposition. First, it argues that, because HUD was empowered to amend its regulations at any time, the Owners should have expected that the regulatory scheme would change and that they thus would be required to remain in the program. Second, it argues that the Owners should have anticipated that Congress might seek to alleviate the shortage in low-income housing by forcing the Owners to remain in the program so that Congress could achieve its goal of providing low-income housing. Third, it argues that, because the low-income housing market was a highly regulated field, the Owners could not have reasonably expected that they could exit the program after twenty years. We agree with the holding in *Cienega Gardens v. United States*, No. 02–5050, 331 F.3d 1319 (Fed. Cir. June 12, 2003); ("*Cienega VIII*") decided today, that none of these arguments is sufficient, in and of itself, or taken together, to demonstrate that the Owners' expectations were not reasonable.

However, *Cienega VIII* makes clear that its holding is limited to the Model Plaintiffs involved there, the "well-developed record" and "the limited arguments advanced by the government." *Cienega VIII*, at 1324, 1349. Unlike the situation in *Cienega VIII* with respect to the Model Plaintiffs, the record before us does not allow a resolution of the objective reasonable expectations. We hold that summary judgment for either party is not appropriate on this record. In other words, while the government has not shown that the Owners' expectations were unreasonable as a matter of law, for the reasons we now discuss, we cannot hold the opposite is the case, *i.e.*, that the Owners have established that their expectations were reasonable as a matter of law.

█ In any regulatory takings case, the trial court must determine the extent

of the government action and its economic impact on the project owners. *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646. This is pertinent not only to the government action and economic impact component of the *Penn Central* analysis, but also to whether the Appellants had reasonable expectations. The reasonableness of particular expectations must be compared with the action that the government has actually taken and its economic impact on the Owners. *Id.*

On this appeal, the Owners contend that the government action and the economic consequences of the temporary restriction of the prepayment right were severe because they were required to remain in the program on the same terms as prevailed during the previous twenty years. (Appellants' Br. at 55.) They conclude as a result that they had a return of less than one percent during the applicable period. *Id.* But this is mere assertion without the benefit of a record or trial court findings. The economic impact finding in *Cienega VIII* was based directly on testimony and trial court findings of economic impact that were not clearly erroneous. *Cienega VIII,* at 1341. The *Cienega VIII* court stated: "This court's assessment of the economic impact is that the Model Plaintiffs' expert's calculations (and the finding by the trial court about the credibility of that expert's methods) proved sufficient financial loss on the part of the Model Plaintiffs for this factor to favor compensation for them, especially in view of the lack of any specific challenge by the government of the trial court's findings or of the Model Plaintiffs' methods and data." *Id.* at 1345. However, the court concluded that "[w]ithout additional information about the rest of the plaintiffs, this court cannot make any

determination regarding them." *Id.* Here too the record as to economic impact remains to be made. ELIHPA prevented the Owners from prepaying, but the limitation was for a period of only two years.[7] LIHPRHA, by contrast, did not simply prevent prepayment. Rather, it created a complex statute, which vested discretion in HUD and authorized HUD to provide additional incentives for the project owners to remain in the program, including increased rents, an increased rate of return, and the ability to withdraw an amount of equity through a second mortgage. 12 U.S.C. §§ 4104, 4109 (Supp. II 1990).

To determine the nature of the government action, the court should determine how HUD would have exercised that discretion (which may be clear here from the agreements and proposed agreements). The court should also calculate the rate of return on invested capital under the new statutes as implemented by HUD and the reasonableness of that return. Determination of net investment may, in turn, require consideration of the government tax benefits afforded to the property owners.

Additionally it is pertinent whether the party seeking compensation has created or contributed to the problem the government seeks to solve. *E. Enters. v. Apfel,* 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998); *Connolly v. Pension Benefits Guar. Corp.,* 475 U.S. 211, 227, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986); *Commonwealth Edison,* 271 F.3d at 1349. The Owners contend that their exit from the program did not cause the dearth of public housing that the legislation sought to address and that it is unfair to saddle them with the burden of providing it. No record has yet been made that would allow a decision on this issue.

---

**7.** It should be noted that ELIHPA had no effect on the Owners' actual ability to prepay. The owners' options became effective only after enactment of LIHPRHA, which superseded ELIHPA.

The government nonetheless argues that the Owners should have foreseen that "presented with a potential shortage of low-income rental housing occasioned by the threat of widespread prepayment of mortgage loans, Congress might very well respond by eliminating or placing conditions upon the prepayment of such loans . . . to achieve the purpose of the" legislation. We agree with *Cienega VIII* that the government cannot establish that the plaintiffs contributed to the problem that the legislation sought to address simply by showing that Congress might predictably seek to impose the burden of solving the problem on the Owners. *Cienega VIII*, at 1337. Rather, in order to establish the relationship, the government must establish that the Owners should reasonably have expected that withdrawals from the program would contribute to an increased shortage of low-income housing—the problem that ELIHPA and LIHPRHA sought to address. This issue should be addressed on remand. Development of the record may lead to a different result.

The Owners argue that because the prepayment right appeared in the contemporaneous regulations and the Owners' loan notes, their expectation that the right would not be restricted was reasonable. Again, that assumption was appropriate in *Cienega VIII* given that the government in that case pointed to nothing beyond the regulations and the notes. *Cienega VIII*, at 1349. The record here may differ. *Commonwealth Edison* requires that the state of the law as a whole be considered in assessing whether investment-backed expectations are reasonable. *Id.* 1349–50. The court should consider the overall state of the law concerning reasonable expectations, including contemporaneous publications and private placement memoranda, the legislative history of the various statutes, and past actions taken with respect to other federally subsidized housing programs. *Id.* at 1349–51.[8]

Finally, the Owners argue that the government's bare assertion that low-income housing is a highly regulated industry is not sufficient to defeat all reasonable expectations. We agree with *Cienega VIII* that the highly regulated nature of the subsidized housing industry "does not mean that *all* regulatory changes are reasonably foreseeable or that regulated businesses can have *no* reasonable investment-backed expectations whatsoever." *Cienega VIII*, at 1350. But that does not suggest the level of regulation of the low-income housing industry is irrelevant. On the contrary, in *Cienega VIII* we explicitly recognize that "[t]he range of expectations that is reasonable may be greatly reduced in proportion to the amount of regulation, but this is not a blanket rule that disqualifies parties' expectations without inquiry." *Id.* at 1350. Indeed, in *Commonwealth Edison* we held that the extent of regulation is a relevant factor in the determination of reasonable expectations. 271 F.3d at 1348. On remand, the court should consider the level of regulation of the low-income housing industry as a pertinent but not determinative factor.

In rejecting the plaintiffs' and the defendant's arguments based on this record and by remanding for a more searching factual inquiry, we have not predetermined the question of whether the plaintiffs will be able to establish the existence of a regulatory taking under the *Penn Central* stan-

---

**8.** We do not suggest that the United States's internal memoranda are pertinent to the reasonable expectations of the project owners since they were unaware of these memoranda. In considering any requests for further discovery, the court must recognize that the pertinent reasonable expectations are those of the project owners, not of the United States.

dards. In the final analysis the Owners here, like the Model Plaintiffs in *Cienega VIII*, may be able to establish that combination of government action, impact and reasonable expectations that would entitle them to recover. At this stage we have done no more than reject the arguments of both the United States and the Owners that this matter can be properly decided on the present record. Therefore, the Court of Federal Claims must conduct a searching factual inquiry using an objective analysis to determine the reasonable investment-backed expectations of the Owners.

## III. CONCLUSION

Accordingly, we affirm-in-part and reverse-in-part the Court of Federal Claims's grant of summary judgment, and remand for further proceedings consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.*

## IV. COSTS

Each party to bear its own costs.