**ALLEGRE VILLA, a Limited Partnership, et al.,
Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 98–823C.

United States Court of Federal Claims.

March 22, 2004.

6.  Complaint ¶¶ 15–18.

7.  *Id.* at 7.

Jeff H. Eckland, Minneapolis, MN, for plaintiffs. William L. Roberts and Mark J. Blando, Faegre & Benson LLP, of counsel.

Shalom Brilliant, Washington, DC, with whom was Assistant Attorney General Peter D. Keisler, for defendant. Phillip L. Southers, Office of the General Counsel, Community Development Division, Department of Agriculture, of counsel.

## *OPINION*

MILLER, Judge.

This case is before the court on defendant's motion for summary judgment and plaintiffs' cross-motion for partial summary judgment on liability. Plaintiffs are numerous business-entity property owners that entered into mortgage contracts with the Government in exchange for providing low- and moderate-income housing. These mortgage contracts originally allowed prepayment; however, a subsequent Act of Congress delayed and restricted the right to prepay the mortgages. The issue before the court is whether the subsequent legislation constituted a breach of the mortgage contracts and whether plaintiffs can maintain an action based on an alleged property interest that was taken through regulation. Argument is deemed unnecessary in view of the several opinions from other judges of the U.S. Court

of Federal Claims that have addressed the asserted breach of contract.

## FACTS

The parties agree on the material facts. Ninety-five owners of property used as affordable housing in rural areas of the United States ("plaintiffs") entered into loan transactions as provided by section 515 of the Housing Act of 1949, later codified at 42 U.S.C. § 1485 (2000) ("section 515"). The loan program was administered by the Farmers Home Administration (the "FmHA"), a division of the Department of Agriculture. The section 515 program, created in 1962, allowed the FmHA to make loans to property owners for the production of low-income rental housing. The loans were for a term of 50 years, with repayment terms of principal and interest established by the FmHA.

In exchange for receiving the loans from the FmHA, the borrowers agreed to use the funds for low- and moderate-income housing in rural areas. Each of the plaintiffs entered into the section 515 program and executed a loan agreement, promissory note, mortgage or deed of trust, and other documents that set forth the terms of the mortgage from the FmHA. In addition to promising to use the property for low- and moderate-income housing, the property owners agreed to maintain certain accounts and records and abide by all appropriate regulations. The FmHA regulations covered allowed rate of return, maintenance of records, use of the housing, and transfer of the property. The loan agreements also stated that the loans would be "administered subject to the limitations of the authorizing act of Congress and related regulations."

The promissory notes used by the FmHA were standard documents prescribed by 7 C.F.R. § 1822.95(c) (1978), which provided that "[p]repayments of scheduled installments, or any portion thereof, may be made at any time at the option of Borrower." Upon prepayment of the FmHA loan, the property owners could terminate their participation in the program and use their buildings as market-rent properties.

Originally only non-profit entities could benefit from the program, but, beginning in 1972, the FmHA offered loans to private for-profit owners under section 515. All of the business-entity plaintiffs are private for-profit owners that entered the program after 1972.

By 1979 many section 515 property owners were beginning to prepay their mortgages, as permitted by the agreements. Having been made aware of this development, Congress found that it threatened the program's goal of providing discounted housing. In response Congress amended the program on December 21, 1979, by prohibiting prepayment unless the property owner agreed to maintain use of the property as low-income housing for either 15 or 20 years following the original loan date. *See* Housing and Community Development Amendments of 1979, Pub.L. No. 96–153, 93 Stat. 1101 (1979). The extension could only be waived by the FmHA if it determined that low-cost housing was no longer needed in the area or if housing assistance was no longer provided to the property's residents. *Id.* at § 503(b), 93 Stat. 1134–35. One year later Congress amended the 1979 restrictions on prepayment so that they would not apply retroactively, but only with respect to loans entered into after that amendment was enacted.

By 1987 prepayment of section 515 mortgages had increased, as the exhaustion of tax benefits under the program was "driving owners to prepay or to refinance their FmHA loans, without regard to the low income and elderly tenants in these projects." H.R.Rep. No. 100–122(I) (1987), *reprinted in* 1987 U.S.C.C.A.N. 3317, 3369. Reacting to the increased prepayments, Congress passed the Emergency Low Income Housing Preservation Act of 1987, (codified as amended at 42 U.S.C. § 1472(c) (2000), and 12 U.S.C. § 1715*l* (2000) ("ELIHPA")).

ELIHPA amended the section 515 program by retroactively imposing restrictions on the prepayment of mortgages entered into before December 21, 1979. Before the FmHA could accept a prepayment, the property owner must "make a binding commitment to extend the low income use of the assisted housing and related facilities for not less than the 20–year period beginning on the date on which the agreement is executed." Pub.L. No. 100–242, § 241, 101 Stat. 1886–87.

If the property owner refused to enter into the extension agreement, but still insisted on prepaying the mortgage under the terms of the original loan, the FmHA could force the owner to sell the housing to "any qualified nonprofit organization or public agency at a fair market value determined by 2 independent appraisers." *Id.* at § 241, 101 Stat. 1887. Absent a forced sale or an agreement to voluntarily extend the program, the FmHA would only allow prepayment of the mortgage if it determined that housing opportunities would "not be materially affected" by the prepayment, current housing tenants would not be displaced, and an "adequate supply" of affordable housing was available in the property's market. *Id.* at § 241, 101 Stat. at 1889.

In 1992 Congress again amended section 515 with enactment of the Housing and Community Development Act of 1992 ("HCDA"), Pub.L. No. 102–550, 106 Stat. 3672, later codified at 42 U.S.C. § 1472(c). HCDA extended the 1987 ELIHPA restrictions on prepayment of mortgages made before December 1979 to include loans made after December 1979 and until 1989. Therefore, the ELIHPA restrictions on prepayment were applied to all section 515 loans made before 1989.

Several plaintiffs have requested permission from the FmHA to prepay their mortgages without restrictions by filing formal prepayment applications. No request for prepayment has been granted by the FmHA, and in many cases the FmHA has made an explicit determination that sufficient alternative housing is not available in the area where the property is located. Another group of plaintiffs consists of owners that are aware of the FmHA's denial of prepayment applications and, believing the tendering of an application to be futile, have not submitted prepayment applications. The third group of plaintiffs consists of post–1979 owners that have not yet reached their 20–year anniversary that would trigger their contractual right to prepayment. These plaintiffs be-

lieve, based on statements from the FmHA and denial of other owners' applications, that their prepayment right will not be honored.

Following the denial of prepayments, all three groups of plaintiffs brought the current suit alleging breach of contract and a taking of property without compensation in violation of the Fifth Amendment. At the request of the parties, the action was stayed pending the outcome of *Franconia Assocs. v. United States*, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (2002), which the parties hoped would resolve the present action. Ultimately, *Franconia* was not determinative. The Supreme Court confined its holding to the bar of the statute of limitations, ruling that breach of contract actions by section 515 program borrowers may go forward because the limitations period commenced upon the tendering of prepayment, not the enactment of ELIHPA and HCDA. *Id.* at 149, 122 S.Ct. 1993. After a stay of over three years, the parties are now ready to proceed.

## DISCUSSION

### 1. *Jurisdiction and standard of review*

The Court of Federal Claims is empowered by the Tucker Act, 28 U.S.C. § 1491(a)(1) (2000), to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States." Plaintiffs allege two claims against the Government-breach of contract by the United States and a taking of property without compensation, a violation of the Fifth Amendment. These two claims come squarely within Tucker Act jurisdiction.

Summary judgment is appropriate for plaintiffs' claim that their contracts were breached because "contract interpretation questions are questions of law." *Coyle's Pest Control, Inc. v. Cuomo*, 154 F.3d 1302, 1304 (Fed.Cir.1998). Summary judgment may also be appropriate for plaintiffs' takings claim; "that it is a takings case does not affect the availability of summary judgment when appropriate to the circumstances."

*Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir.1996).

Defendant argues that plaintiffs' contract claims are barred by the unmistakability doctrine. Defendant also contends that plaintiffs did not possess property rights that could have been taken, but, even if plaintiffs had such rights, plaintiffs could not establish that the regulatory taking interfered with reasonable, investment-backed expectations.

Plaintiffs counter that the enactment of ELIHPA and HCDA amounted to repudiation of their original contracts, which became a breach when the plaintiffs sought to prepay their mortgages. According to plaintiffs, the Government was not acting in its sovereign capacity when it repudiated the contracts, and the unmistakability doctrine therefore does not apply. Even if it did, plaintiffs maintain that the requirements of the doctrine were satisfied. For the takings claim, plaintiffs argue that summary judgment is inappropriate because plaintiffs claim to hold a state-law property interest that effectively was taken through government regulation.

### 2. *Whether the unmistakability doctrine bars the contract claims*

Plaintiffs' contract claims are based on the prepayment clause found in the mortgage agreements, which grants the right to prepay the mortgages without restriction. The enactment of ELIHPA and HCDA, in 1987 and 1992, respectively, restricted the right to prepayment by requiring FmHA approval because of changed conditions or an agreement by the property owner to maintain the property as assisted housing.

Undeterred by appellate courts suggesting that they would not be receptive to this argument, defendant maintains that no breach occurred. *See Franconia*, 536 U.S. at 133, 122 S.Ct. 1993 ("Accepting for purposes of this decision that the loan contracts guaranteed the absolute prepayment right ... ELIHPA's enactment, we conclude, qualified as a repudiation of the parties' bargain .... Accordingly, breach would occur ... when a borrower tenders prepayment and the Government then dishonors its obligation to accept the tender and release its control over use of the property."); *Franconia*, 240 F.3d

1358, 1363 (Fed.Cir.2001) ("FmHA's contractual duty in this case ... [is] to continue to allow borrowers the unfettered right to prepay their loans at any time"), *rev'd*, 536 U.S. 129, 122 S.Ct. 1993, 153 L.Ed.2d 132 (reversing lower-court ruling that action barred by the statute of limitations).

Plaintiffs' loan agreements contained a clause that specifically granted the right to prepay the mortgages, and the subsequent enactment of ELIHPA and HCDA significantly limited that prepayment right. The issue before the court thus devolves to whether the unmistakability doctrine bars plaintiffs from seeking redress.

■ The unmistakability doctrine recognizes that the Government surrenders its sovereign power when entering into contracts only when done so in unmistakable terms. *Bowen v. Public Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (holding that "contractual arrangements, including those to which a sovereign itself is party, 'remain subject to subsequent legislation' by the sovereign") (citation omitted). Therefore, a contract with the Government "will not be read to include an unstated term exempting the other contracting party from the application of a subsequent sovereign act (including an Act of Congress)." *United States v. Winstar Corp.*, 518 U.S. 839, 878, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996).

Plaintiffs argue that the unmistakability doctrine is inapplicable because the Government was not acting in its sovereign capacity when it repudiated plaintiffs' contracts. In response defendant presses the novel argument, exsanguinated from the *Winstar* concurrence and dissent, which, according to defendant, state that the unmistakability doctrine is available even if the sovereign acts doctrine is not. *See id.* at 920, 116 S.Ct. 2432 (Scalia J. concurring); *id.* at 931, 116 S.Ct. 2432 (Rehnquist, J. dissenting).

■ The sovereign acts doctrine is an affirmative defense under which the United States, when sued as a party to a contract, "cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925). The purpose of the doctrine is to balance "the Government's need for freedom to legislate with its obligation to honor its contracts." *Winstar*, 518 U.S. at 896, 116 S.Ct. 2432. However, the doctrine "does not relieve the Government from liability where it has specially undertaken to perform the very act from which it later seeks to be excused." *Freedman v. United States*, 162 Ct.Cl. 390, 402, 320 F.2d 359, 366 (1963). Otherwise, the Government could avoid any contractual obligation simply by enacting legislation.

■ Instead, "when the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Winstar*, 518 U.S. at 895, 116 S.Ct. 2432. "The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." *Yankee Atomic Elec. Co. v. United States*, 112 F.3d 1569, 1575 (Fed.Cir.1997). Thus, the doctrine would not apply if "the sovereign act is properly attributable to the Government as contractor" and if the specific legislation was designed to target prior government contracts. *Winstar*, 518 U.S. at 896, 116 S.Ct. 2432.

■ In the case at bar, the enactment of ELIHPA and HCDA was not a sovereign act. Rather, these statutes specifically targeted FmHA agreements with section 515 program borrowers. *See* 42 U.S.C. § 1472(c)(1)(A) and (c)(4)(A). As evident from the legislative history, Congress was aware of the FmHA contracts and the potential breach that these statutes could cause. *See* 126 Cong. Rec. H 22650 (1980) (statement of Rep. Butler) ("[I]n legal terms this is called ... an impairment of the obligations of a contract. In layman terms it is called changing the rules in the middle of the game. In come circles it is called welching."); 136 Cong. Rec. S 26372 (1990) (statement of Sen. Heflin) ("[T]he obligation of the U.S. Government is to fulfill contractual agreements into

which it enters, or, at a minimum, to justly compensate those parties whose contractual rights it abrogates.").

This is not a ground-breaking analysis, as other courts and judges of the court previously have found that ELIHPA and HCDA do not constitute sovereign acts. *See Kimberly Assocs. v. United States,* 261 F.3d 864, 870 (9th Cir.2001) ("It is unquestionable that, when it altered the terms of its contract with [section 515 borrowers], the government was not acting in a 'public and general' capacity."); *Grass Valley Terrace v. United States,* 51 Fed.Cl. 436, 442–43 (2002) (finding ELIHPA and HCDA were targeted at critical prepayment option and are not sovereign acts); *Adams v. United States,* 42 Fed.Cl. 463, 479 (1998) (holding enactment of ELIHPA and HCDA was not sovereign act).

The courts uniformly have ruled that where the sovereign acts doctrine is inapplicable, the unmistakability doctrine does not apply. This direction comes from the Supreme Court's plurality opinion in *Winstar:* "[N]o sovereign power is limited by the Government's promise to purchase and a claim for damages implies no such limitation. That is why no one would seriously contend that enforcement of humdrum supply contracts might be subject to the unmistakability doctrine." *Winstar,* 518 U.S. at 880, 116 S.Ct. 2432. In the absence of a sovereign act, "the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it." *Id.* Given this clear statement of the doctrine, defendant's grounding its argument on *Winstar* is mystifying.

The only opinion issued by the Federal Circuit that directly addresses the interplay between the unmistakability and sovereign acts doctrines since *Winstar* is *Yankee Atomic,* in which the unmistakability doctrine was applied. *Yankee Atomic,* 112 F.3d at 1579–80. Although not explicitly stated, the appeals court applied the unmistakability doctrine only after it ruled that the sovereign acts doctrine applied. *See id.* at 1577. This result is supported by persuasive authority, as well as other decisions from the Court of Federal Claims. *See Kimberly,* 261 F.3d at 869; *Resolution Trust Corp. v. FSLIC,* 34

F.3d 982, 984 (10th Cir.1994) ("Only if the sovereign acts doctrine applied would we be required to address the issue of unmistakability."); *Grass Valley Terrace,* 51 Fed.Cl. at 443 (holding unmistakability doctrine not applicable because sovereign acts doctrine does not apply); *General Dynamics Corp. v. United States,* 47 Fed.Cl. 514, 545 (2000) (same). *Contra Adams,* 42 Fed.Cl. at 478, 484 (applying unmistakability doctrine despite finding sovereign acts doctrine inapplicable).

### 3. Date of contract breach

The court finds that the Government breached plaintiffs' contracts, to which no valid defense was offered. Plaintiffs allege that each property owner entered into a loan agreement after 1972, but prior to December 15, 1989. Although the Government breached its contracts with plaintiffs during that time frame by enacting ELIHPA and HCDA, the parties have not submitted factual findings for the exact dates on which each plaintiffs' contract was breached. In the context of ELIHPA, the Supreme Court has held that a "breach would occur when a borrower attempted to prepay, for only at that time would the Government's responsive performance become due." *Franconia,* 536 U.S. at 143, 122 S.Ct. 1993. Accordingly, the date of breach for plaintiffs that attempted prepayment is the date on which such attempt was made.

The passage of ELIHPA and HCDA operated as a repudiation on the part of the Government, which "ripens into a breach prior to the time for performance only if the promisee 'elects to treat it as such.'" *Id.* The option to choose the date of breach by filing suit arises because repudiation "give[s] the promisee the right of electing ... to wait till the time for [the promisor's] performance has arrived, or to act upon [the repudiation] and treat it as a final assertion by the promisor that he is no longer bound by the contract." *Roehm v. Horst,* 178 U.S. 1, 13, 20 S.Ct. 780, 44 L.Ed. 953 (1900). Contracts with plaintiffs for which the right to prepayment has not yet vested were breached on the date this lawsuit was filed, because those plaintiffs have chosen to treat the Government's repudiation as a breach.

■ Plaintiffs assert that property owners holding vested prepayment rights, but which did not attempt to prepay, believed that any attempt to prepay would be futile. This assertion is based on the FmHA's refusal to accept attempted prepayments from other owners and statements from the FmHA. These plaintiffs' contracts may have been breached on the date that they believed any prepayment would be futile, but, in any event, no later than the filing of the present action.

### 4. *Plaintiffs' takings claims*

Plaintiffs claim that ELIHPA and HCDA constituted a taking of their property, not by physical invasion, but by regulatory imposition. To prove a taking, plaintiffs must satisfy two proofs. First, plaintiffs must show they hold a property right protected by the Fifth Amendment. *M & J Coal Co. v. United States,* 47 F.3d 1148, 1154 (Fed.Cir.1995) (stating that "a court should inquire into the nature of the land owner's estate to determine whether the use interest proscribed by the governmental action was part of the owner's title to begin with"). If such a right is present, then plaintiffs must show that the Government action at issue constituted a taking of that property right.

"A takings claim has limited application when a claimant has a viable breach remedy." *Detroit Edison Co. v. United States,* 56 Fed.Cl. 299, 301 (2003). This is so because "[v]irtually *every* contract operates, not as a guarantee of particular future conduct, but as an assumption of liability in the event of nonperformance: The duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, –and nothing else." *Winstar,* 518 U.S. at 919, 116 S.Ct. 2432 (Scalia, J., concurring) (citations omitted). Thus, when the "relative rights of party litigants" have been "voluntarily created by contract," interference with those rights "generally gives rise to a breach claim not a taking claim." *Hughes Communications Galaxy, Inc. v. United States,* 271 F.3d 1060, 1070 (Fed.Cir.2001) (citations omitted).

If the right at issue is not governed by the terms of the parties' contract, plaintiffs may pursue a takings action. *See Prudential Ins. Co. v. United States,* 801 F.2d 1295, 1300 n. 13 (Fed.Cir.1986) (noting that takings claim may offer plaintiff relief where contract claim is ineffective). Also, rights that arise independently from the contract may be brought through a takings action. *See Integrated Logistics Support Sys. Int'l, Inc. v. United States,* 42 Fed.Cl. 30, 34–35 (1998) (refusing to dismiss takings claim when court could not conclude whether contract conferred rights at issue).

■ When a contract between a private party and the Government creates the property right subject to a Fifth Amendment claim, the proper remedy for infringement lies in a contract claim, not one for a taking. *Sun Oil Co. v. United States,* 215 Ct.Cl. 716, 769, 572 F.2d 786, 818 (1978) (holding that "the concept of a taking as a compensable claim theory has limited application to the relative rights of party litigants when those rights have been voluntarily created by contract"). In the case at bar, plaintiffs have rested this claim on a contract right to prepayment that was substantially limited by subsequent legislation. Given that contract right, plaintiffs' recovery lies in a theory of breach, not takings. *See Detroit Edison Co.,* 56 Fed.Cl. at 303 (2003); *Fifth Third Bank v. United States,* 57 Fed.Cl. 586, 588 (2003) (relying on precedent that states "when a breach of contract remedy is available in a *Winstar* setting, a takings remedy is not"), *appeal docketed,* No. 04–5009 (Fed.Cir. Oct. 17, 2003).

The Federal Circuit affirmed a Court of Federal Claims ruling that "despite breaching the contract, the government did not take the plaintiffs' property because they retained 'the range of remedies associated with the vindication of a contract.'" *Castle v. United States,* 301 F.3d 1328, 1342 (Fed.Cir.2002). According to the Federal Circuit, in the context of a *Winstar* contract, a takings claim "fails because even assuming it was breached, the alleged contract did not create a reasonable expectation that the government would cease regulating the thrift industry, or any particular thrift." *Id.* Instead of conferring a right protected from a taking, "the contract promised to either regulate [plain-

tiffs] consistently with the contract's terms, or to pay damages for breach." *Id.*

The position of plaintiffs in the case at bar is distinguishable from those in which the Federal Circuit did allow a takings claim to proceed. *See Cienega Gardens v. United States,* 331 F.3d 1319 (Fed.Cir.2003); *Chancellor Manor v. United States,* 331 F.3d 891 (Fed.Cir.2003). In both *Cienega Gardens* and *Chancellor Manor,* plaintiffs entered into loan agreements with private lenders that were insured by the Department of Housing and Urban Development. The Government subsequently restricted the plaintiffs' prepayment right, which the appeals court ruled was a taking. Because their contracts were with private lenders, plaintiffs in *Cienega Gardens* and *Chancellor Manor* were not in privity with the Government; thus, no contract claim against the Government was available to address the subsequent prepayment limitations by the Government. The present action, in contrast, involves plaintiffs that entered into contracts directly with the Government, and such contracts provide a remedy for the later prepayment restrictions.

## CONCLUSION

Based on the foregoing, the court finds and concludes that the Government breached plaintiffs' contracts. Accordingly,

**IT IS ORDERED**, as follows:

1. Plaintiffs' cross-motion for partial summary judgment on liability is granted; defendant's motion for summary judgment on plaintiffs' contract claims is denied.

2. Defendant's motion for summary judgment on plaintiffs' takings claims is granted insofar as plaintiffs' contract claims address the same right to prepayment.

3. The parties shall file a Joint Status Report by April 22, 2004, proposing classes of plaintiffs or another means of determining the breach date for each plaintiff, as well as a proposed schedule and deadline for discovery relating to damages.