**O. AHLBORG & SONS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 02–272C.

United States Court of Federal Claims.

Oct. 31, 2006.

Robert D. Luskin, Patton, Boggs, L.L.P., Washington, DC, and Mark Russo, Ferrucci Russo, P.C., Providence, RI, for Plaintiff.

Sheryl L. Floyd, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendant.

## OPINION

WILLIAMS, Judge.

Plaintiff, O. Ahlborg & Sons, Inc. ("Ahlborg"), seeks $2,199,000 pursuant to an alleged implied-in-fact contract with the Maritime Administration of the United States Department of Transportation ("MARAD"). In the alternative, Plaintiff seeks to recover as a third-party beneficiary under a contract among MARAD, Massachusetts Heavy Industries, Inc. and MHI Shipbuilding, LLC.[1] This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment and Defendant's Cross–Motion to Dismiss for Lack of Subject Matter Jurisdiction or, in the Alternative, for Partial Summary Judgment.

Because Plaintiff lacks the contractual privity necessary to establish third-party beneficiary status and jurisdiction in this Court, this claim is dismissed. Because Plaintiff fails to establish an implied-in-fact contract with MARAD, the Court grants Defendant's Motion for Partial Summary Judgment as to this claim.

### Background [2]

Title XI of the Merchant Marine Act of 1936, 46 App. U.S.C. § 1271 et seq., ("Title XI") empowered MARAD to issue loan guarantees to private parties seeking private loans to renovate and rebuild shipyards. Id. Pursuant to Title XI, MARAD issued a Letter Commitment on November 1, 1996, to guarantee a loan taken by MHI up to $55,000,000 to finance the planned reactivation of the Quincy Fore River Shipyard, in Quincy and Branch, Massachusetts ("Shipyard"). Def's. Mot. Tab 1. Massachusetts Heavy Industries, Inc. was the owner of the Shipyard. Pl.'s Mot. Tab D § 1.1(b). MHI Shipbuilding, LLC leased the Shipyard from Massachusetts Heavy Industries, Inc. in order to effect the modernization and reactivation and to operate the Shipyard after it returned to commercial use. Id.

### The Construction Contract Between Ahlborg and MHI

MHI Shipbuilding, LLC entered into a construction contract ("Construction Contract") with Ahlborg on November 24, 1997, for construction services in connection with the renovation and modernization of the Shipyard. Pl.'s Mot. Tab D at 1. MHI Shipbuilding was to lease the Shipyard from Massachusetts Heavy Industries and would be responsible for the construction of the first ships built after the Shipyard returned to commercial status. Pl.'s Mot. Tab D § 1.1. MHI contracted with Ahlborg for "the fabrication, construction and installation of a major new building and its joinder with a retained building to create the main fabrication and assembly facility for Shipbuilding." Id. § 1.1(c). Ahlborg's responsibilities under the Construction Contract included, inter alia: coordinating its work with MHI to ensure timely completion of the project, purchasing materials, equipment, goods, acquiring permits, and accepting responsibility for the work completed by all subcontractors. Id. §§ 1.3–1.18, 3.2, 5.1, 6.1, 7.1, 16.2.

In exchange for the work performed, MHI was obligated to pay Ahlborg a total of $17,742,995. Pl's. Mot. Tab D § 4.1. Payments were to be made pursuant to procedures set out in the Construction Contract. Id. Ahlborg was required to submit an application by the tenth day of each month requesting payment for the value of the work performed since the previous payment based on the schedule of values in the Construction Contract. Id. § 5.1(b). Each application had to contain:

> a certification by the Contractor as to the Work done during the month in question and ... (i) a release and waiver of liens from the Contractor and each Subcontractor for all Work performed prior to the

---

1. Collectively, Massachusetts Heavy Industries and MHI Shipbuilding will be referred to herein as MHI. In any discussion of the companies in their individual capacities, the Court will refer to the companies by their full names.

2. This background is derived from the Complaint, the attachments to Plaintiff's Motion for Partial Summary Judgment ("Pl.'s Mot.") and Defendant's Motion to Dismiss ("Def.'s Mot".), as well as judicial decisions in related actions— Alhborg's actions against MHI in the Superior Court of Massachusetts and MHI and MARAD in the United States District Court for the District of Massachusetts.

date of such Application for Payment ... (ii) certification by the Contractor that all amounts due and owing to Subcontractors in accordance with their contracts, purchase orders and other supply arrangements have been paid in full ... (iii) such reasonable additional supporting documentation as the Operator may request in order to satisfy the requirements of the Lender.

*Id.* § 5.1(c). Within ten days of receiving the application, MHI was to inspect the work and provide Ahlborg with a copy of the request for payment that MHI was submitting to MARAD.[3] *Id.* § 5.1(d). Within twenty days of receiving the application for payment, MHI was obligated to pay Ahlborg "the amount for which payment [was] sought." *Id.* § 5.1(e).

MARAD was not a signatory to the Construction Contract. *Id.* However, MARAD participated in the negotiation process. Affidavit of Richard Lorr, dated February 4, 2004, Def.'s Mot. Tab 2 ¶ 3. As a result, the Construction Contract included numerous provisions that gave MARAD rights. For example, Sections 1.9 and 1.11 required Ahlborg to allow MARAD and MHI to observe, inspect, and test Plaintiff's work at any time. Pl.'s Mot. Tab D § § 1.9 and 1.11. Section 1.16 required Ahlborg to make its construction records available for MARAD's inspection. *Id.* § 1.16. In addition, the Construction Contract listed MARAD's $55,000,000 guaranty as the primary source of funding for the project. *Id.* § 1.1(b) ("The major portion of the financing for the Project is being provided through a bank loan of up to $55 million guaranteed by the U.S. Government under the so-called Title XI Program administered by the Maritime Administration."). Pursuant to Section 16.6 of the Construction Contract, Ahlborg had to obtain a performance bond and a payment bond from the same bonding company. *Id.* § 16.6. The bonding company had to be satisfactory to both MHI and MARAD, and the bonds had to list both MHI and MARAD as obligees. *Id.*

The Construction Contract did not allow Ahlborg or MHI to assign the contract to a third party without consent of the other, except that MHI was allowed to "collaterally assign" its interest and obligations under the Construction Contract to MARAD as additional security. *Id.* § 18.1. MHI, however, remained "fully responsible" for all of its obligations and liabilities under the contract unless and until MARAD substituted another party for MHI. *Id.*

### The Security Agreement

Fleet National Bank ("Fleet") agreed to lend MHI up to $55 million for the reactivation of the Shipyard. Security Agreement, Pl.'s Mot. Tab A at 1.[4] MARAD agreed to guarantee this loan under the provisions of Title XI. *Id.* at 2. The Security Agreement was executed by MHI and MARAD on December 17, 1997, as part of the financial closing. *Id.* The Security Agreement stated that it was for the sole benefit of MHI, MARAD and their respective successors and assigns. It further specified that "no other Person shall have any right hereunder." *Id.,* General Provisions at 41. The purpose of the Security Agreement was "to provide security to [MARAD] for the Secretary's Note." *Id.,* Special Provisions at 2. The Secretary's Note was a promissory note to MARAD from MHI in the amount of $55 million, equal to the principal amount of the loan MARAD was guaranteeing. *Id.* at 7. The security interests granted to MARAD included: (i) any construction contracts relating to construction of the Shipyard; (ii) rights to any money that would become due with respect to the Shipyard assets, not including operating revenues; (iii) all goods, materials, parts, and other tangible property

---

3. MHI submitted a request of payment to MARAD in order to have MARAD release the appropriate funds from the escrow account, which according to the Security Agreement, were to be paid directly to the "Contractor," *i.e.,* Ahlborg. *See* Pl.'s Mot. Tab A, General Provisions § 5.02(b). The Construction Contract identified MHI as the party that had the obligation to pay Ahlborg.

4. Tab A of Plaintiff's Motion includes the Consent of Contractor and an unexecuted copy of the Security Agreement attached to the Consent of Contractor. Tab 4 of the Appendix to Defendant's Response and Cross-motion includes the same documents, but with an executed copy of the Security Agreement.

intended to be used in connection with the Shipyard or installed at the Shipyard; (iv) all "moneys, instruments, negotiable documents, chattel paper, and proceeds" in the Title XI Reserve Fund, the Depository, and the Construction Fund; (v) rights to the leases of the property in the Shipyard; (vi) rights to any contracts for construction of vessels financed under Title XI; and (vii) the Mortgages covering the Shipyard and its assets.[5] *Id.* at 4–5. The Security Agreement also stated:

> Irrespective of the [security interests] (1) [MHI] shall remain liable to perform its obligations under each Construction Contract and the above-mentioned other contracts; (2) the Secretary shall not, by virtue of this Security Agreement, have any obligations under [the Construction Contract or other contracts] or be required to make any payment owing by [MHI] thereunder . . .

Security Agreement, Pl.'s Mot. Tab A at 5–6.

The Security Agreement also set up the Escrow Fund into which the $55,000,000 loan was deposited. *Id.,* General Provisions at 23–28. The provisions of the Security Agreement governed when and how funds could be released from the Escrow Fund. *Id.* The Agreement stated that in order to pay contractors, MARAD "shall . . . within a reasonable time after written request from [MHI], disburse from the Escrow Fund directly to . . . the Contractors or any other Person entitled thereto . . . any amount which from time to time [MHI] is obligated to pay." *Id.* § 5.02(b). The Security Agreement also stated if MHI were to default and any of the guarantees become payable by MARAD, "all amounts in the Escrow Fund at the time such Guarantees become payable . . . shall be paid into the Federal Ship Financing Fund created by Section 1102 of the Act and be credited against any amounts due or to become due to the Secretary from [MHI] with respect to all Obligations guaranteed by [MARAD] to which this Security Agreement relates." *Id.* § 5.02(e). On December 18, 1997, Fleet deposited the loan proceeds into the Escrow Fund. *O. Ahlborg & Sons, Inc. v.*

*United States, Mass. Heavy Indus., and MHI Shipbuilding, LLC,* No. 03–10112 (D.Mass. Apr.19, 2005) at 3–4.

### Consent of Contractor

Ahlborg was required to sign a "Consent of Contractor" before MARAD would sign the Security Agreement. Pl.'s Mot. at 3; Affidavit of Glenn Ahlborg dated December 19, 2003 ("Ahlborg Aff."), Pl.'s Mot. Tab E, ¶ 7. The Consent of Contractor exhibited Ahlborg's understanding that the "right, title and interest" of MHI to the Construction Contract were "collaterally assigned" to MARAD should MHI default. *See* Consent of Contractor, Pl.'s Mot. Tab A. This type of agreement was "typical," and the Construction Contract provided for the assignment. Ahlborg Aff. ¶ 7. An original draft of the Consent of Contractor was rejected by Ahlborg's surety. *Id.* ¶ 8. According to Ahlborg's President, the surety was concerned that the Consent of Contractor eliminated Ahlborg's lien rights and did not obligate MARAD to ensure the payment of an approved requisition unless MHI defaulted under an agreement with MARAD. *Id.* ¶ 8. After some discussions between Plaintiff, MHI and MARAD, the Security Agreement was attached to the Consent of Contractor. *See* Ahlborg Aff. ¶ 8–11. A new paragraph was also added to the Consent of Contractor stating that "[N]othing herein shall be deemed to modify the terms and conditions of the Construction Contract, nor shall such consent be deemed a waiver of any rights secured to [Ahlborg]." *Compare* Draft of the Consent of Contractor, Pl.'s Mot. Tab E, Ex. 1 *with* Consent of Contractor, Pl.'s Mot. Tab A.

The Consent of Contractor stated that the Security Agreement would be "execute[d] and deliver[ed] . . . in connection with a loan of up to $55,000,000 by [MHI] that will be guaranteed by the United States, acting through the Secretary [of MARAD]." Consent of Contractor, Pl.'s Mot. Tab A. The Consent of Contractor also provided that "[t]he Secretary shall, by virtue of the Security Agreement, have no obligation or duty

---

**5.** The financial closing agreements set up a number of funds including the Title XI Reserve Fund, the Depository, and the Construction Fund. Se-

curity Agreement, Pl.'s Mot. Tab A, Schedule X at 11, and General Provisions at 19.

under the Construction Contract, and shall not be required to make to the Contractor or to any other entity any payment due and owing by the Company under the Construction Contract." *Id.* The Consent of the Contractor was executed only by Plaintiff, not any other parties. *Id.* ¶ 9.

### Performance of the Contract

In March 1998, following approval of these agreements, MHI issued a Notice to Proceed to Ahlborg. Shortly thereafter, on or about April 3, 1998, Ahlborg filed a notice of contract pursuant to Massachusetts Mechanics' Lien Law, Mass. Gen. Laws ch. 254 § 2 which was recorded in the Norfolk County Registry of Deeds.[6]

Construction work commenced at the Shipyard, and Ahlborg's first eleven requests for payment were disbursed from the Escrow Fund pursuant to the Security Agreement. Ahlborg was paid by MHI consistent with the Construction Contract. First, Ahlborg submitted an application or requisition for payment from MHI. Then, if approved, MHI sent the requisition to MARAD for its approval and payment. *See* Ahlborg Aff. ¶ 12; Affidavit of Michael Harrington dated December 19, 2003 ("Harrington Aff."), Pl.'s Mot. Tab F ¶ 3.

Within days of receiving payment for Invoice No. 11 in the end of June 1999, Ahlborg submitted Invoice No. 12, but MHI refused to process this invoice. Harrington Aff. ¶ 7. According to Mr. Harrington, Ahlborg's Project Director at the Shipyard, MHI disputed Requisition No. 12 "in total, and felt that Ahlborg had not completed the percentage of work that would require MHI to pay anything under Requisition No. 12." *Id.* After some negotiation, MHI took the position that

Ahlborg had completed 74% of the project and was owed $1.4 million under Requisition No. 12. *Id.* ¶ 8. Ahlborg contended it was owed more, but requested MHI to release the undisputed $1.4 million. *Id.* However, MHI would not release the 1.4 million because MHI claimed that Ahlborg had not paid all of its subcontractors. *Id.*

On July 23, 1999, Ahlborg suspended work and notified MARAD that MHI had a right, until August 2, 1999, to cure its default created by its nonpayment. Pl.'s Mot. Tab G.[7] Simultaneously, Ahlborg requested that an Independent Engineer be appointed, pursuant to Section 10.1 of the Construction Contract, in order to determine the percentage of work that Ahlborg had completed to identify how much money Ahlborg was due.[8] *Id.; see* Harrington Aff. ¶ 9.

On August 13, 1999, Ahlborg informed MARAD that MHI's right-to-cure period had expired and that, pursuant to Section 18.4 of the Construction Contract, MARAD had the right to cure the default until August 23, 1999. Pl.'s Mot. Tab H. Pursuant to MARAD's request, Ahlborg agreed to extend the cure period until August 30, 1999, in order to provide the Independent Engineer with time to complete his research. Pl.'s Mot. Tab I; Harrington Aff. ¶ 10. On August 27, 1999, the Independent Engineer determined that Ahlborg had completed 80% of its scope of work and was owed $2,199,000. Harrington Aff. ¶ 11; Pl.'s Mot. Tab J. MHI and MARAD still refused to release the payment from the Escrow Fund, claiming that Ahlborg had not paid its subcontractors. Harrington Aff. ¶ 12. On September 10, 1999, Ahlborg recorded a "statement of account on the property" for unpaid Requisition No. 12 pursuant

---

6. Under Massachusetts law, the filing of a notice of contract automatically granted a lien on the property being worked on in favor of the contractor performing the services. Mass. Gen. Laws ch. 254 § 2. The notice was required to contain the date of the contract, the name of the contractor and the owner of the property, a description of the property and the work being performed. *Id.* The notice of contract covered any contract for the "erection, alteration, repair or removal of a building structure, or other improvement to real property, or for furnishing material or rental equipment, appliances or tools." *Id.*

7. In the event that MHI did not cure its default as of August 2, 1999, MARAD had a twenty-day period in which to cure the default. *Id.*

8. Section 10.1 stated: "Any controversy, dispute or claim between the Contractor and the Operator arising out of or relating to this Contract, or breach thereof (a *'Dispute'*), shall first be referred to the Independent Engineer for mediation/arbitration." Construction Contract § 10.1(a), Pl.'s Mot. Tab D.

to the Massachusetts Mechanics' Lien Statute, Mass. Gen. Laws ch. 254 § 8.[9]

### Massachusetts State Court Litigation

To recover the amount in controversy under the Construction Contract, Ahlborg brought suit in the Norfolk County, Superior Court of Massachusetts against MHI on September 16, 1999, to enforce its mechanics' lien with regard to Requisition No. 12. Pl.'s Mot. at 12. On December 2, 1999, Ahlborg in this same action filed a motion to confirm the decision of the Independent Engineer. See O. Ahlborg & Sons, Inc. v. Mass. Heavy Indus., Inc., 65 Mass.App.Ct. 385, 840 N.E.2d 977, 980 (2006). On January 6, 2000, the Superior Court entered an order granting Ahlborg's motion to confirm the Independent Engineer's decision awarding Ahlborg $2,199,529 against MHI. Compl. Tab V.

On February 18, 2000, MARAD filed a Statement of Interest in Ahlborg's Massachusetts Superior Court action which stated: "MHI had failed to make the first two payments on its $55,000,000 note, and ... as a result of MHI's default, MARAD is the assignee of all of MHI's right, title and interest in the construction contract." Id. at 6; Compl. Tab Y at 3. The Statement of Interest was filed after the order confirming the Independent Engineer's decision because MARAD did not learn of the Court's January 6, 2000 order until January 13, 2006. Id. at 11. MARAD did not seek to intervene in the action, but claimed a direct interest because its security interest in the Shipyard could be adversely affected by the Court's decision. Id. at 12. MARAD stated that it was the "assignee of all of MHI's right, title, and interest under the construction contract at issue in [the] case" and that if MHI did not cure its default under the Security Agreement, MARAD would have the right to enforce its rights under the mortgage and other security interests, including the Construction Contract. Compl. Tab Y at 3. MARAD argued that the January 6, 2000 order should be vacated, and that, had the Court held a full hearing on Ahlborg's motion, the Court would not have confirmed the award. Id. at 12–13.

MHI filed a motion for reconsideration of the Superior Court's entry of judgment for Ahlborg. See O. Ahlborg & Sons, Inc., 65 Mass.App.Ct. 385, 840 N.E.2d 977, 980 (2006). The Court granted MHI's motion for a hearing on the condition that MHI "produce all its correspondence to [the Independent Engineer] that culminated in the report of August 27, 1999." Id. MHI never produced this correspondence, and two years later, MHI filed for bankruptcy. Id.

On May 24, 2002, the Massachusetts Superior Court's order confirming the award was reduced to a judgment against MHI in the amount of $2,199,529. Pl.'s Mot. Tab K at 2. This judgment was affirmed on appeal on January 17, 2006. O. Ahlborg & Sons, Inc. v. Mass. Heavy Indus., Inc., 65 Mass.App.Ct. 385, 840 N.E.2d 977 (2006).

### Default of MHI

On February 25, 2000, MARAD informed MHI that MHI was in default under the Security Agreement and that MARAD had repaid the balance of the loan to the bank under MARAD's guarantee. Def.'s Mot. Tab 13. The balance on the loan as of February 25, 2000, was $59,071,657.60. Id. MARAD effectuated a set-off of the remaining funds in the escrow account against the debt MHI owed MARAD. Id. The escrow account contained approximately $12 million, so MHI still owed MARAD more than $47 million. Id. MARAD did not make any payments to Ahlborg. Pl.'s Mot. at 13; Harrington Aff. ¶ 12. MARAD also demanded that MHI surrender possession of the Shipyard and took control of the Shipyard on February 25, 2000. Id.; Quincy Commerce Center, LLC v. Maritime Administration, Civil No. 03–10307–NG (D.Mass, Feb. 23, 2005), Appendix, Vol. 1, to Def.'s Response to January 5, 2005 Order at 194. The Shipyard was eventually sold at auction. See id. at 192–93, 199.

---

**9.** A statement of account is "a statement giving just and true account of the amount due or to become due [the contractor or subcontractor], with all just credits, a brief description of the property, and the names of the owners set forth in the notice of contract." Mass. Gen. Laws ch. 254 § 8.

*Massachusetts Federal Court Litigation*

In 2003, Ahlborg filed a lawsuit against the United States Department of Transportation, MARAD and MHI in the Norfolk County, Superior Court of Massachusetts, and later transferred that action to the United States District Court for the District of Massachusetts. *See O.H. Ahlborg & Sons, Inc. v. United States, Mass. Heavy Indus., and MHI Shipbulding, LLC,* No. 03–10112 (D.Mass. Apr.19, 2005). The primary issue in that case was whether Ahlborg possessed priority rights to the proceeds that MARAD held as a result of its foreclosure upon the sale of the Shipyard. Ahlborg based its claim of priority on the Massachusetts Mechanics' Lien Statute, Mass. Gen. Laws ch. 254 § 8 and the doctrine of equitable subordination, seeking payment up to the amount of the judgment entered on its behalf in the Massachusetts State Court litigation. On April 19, 2005, the magistrate judge issued a report and recommendation, which concluded that MARAD had priority to the monies realized from its foreclosure of the Shipyard and related property, rejecting Ahlborg's claims of priority. *Supra* No. 03–10112 (D.Mass. Apr. 19, 2005). The District Court adopted the magistrate judge's report and recommendation on June 16, 2005. Ahlborg did not appeal the District Court's decision.

## DISCUSSION

*Plaintiff Is Not Precluded from Relitigating the Issue of MARAD's Obligation to Pay Ahlborg Under the Escrow Fund Provisions of the Security Agreement* [10]

In this proceeding, Plaintiff argues that it is entitled to recover for its work on the

Shipyard as a third-party beneficiary under MARAD and MHI's contract, in particular, the Escrow Fund provisions of the Security Agreement. Alternatively, Plaintiff argues that MARAD agreed to pay Ahlborg under an implied-in-fact contract. At issue in the United States District Court was whether Ahlborg's interest in the foreclosure proceeds had priority over MARAD's mortgage interest under the Massachusetts Mechanics' Lien Statute. *O.H. Ahlborg & Sons, Inc. v. United States, Mass. Heavy Indus., and MHI Shipbulding, LLC,* No. 03–10112 (D.Mass. Apr.19, 2005) (Attachment to Def.'s June 2, 2006 Supp. Mem. ("Dist.Ct.Op.")). Ahlborg's interest derived from its Notice of Contract concerning its construction contract on the Shipyard which it filed and recorded on or about April 3, 1998. MARAD's interest derived from its mortgage on the Shipyard granted in exchange for MARAD's guarantee of the $55,000,000 loan from Fleet Bank to MHI to finance the reactivation of the Shipyard. After MHI defaulted on this loan, MARAD honored its guarantee, repaying approximately $59 million to Fleet. MARAD conducted a foreclosure sale of the Shipyard assets, recovering only some $12 million.

The Massachusetts Mechanics' Lien Statute at issue in the District Court litigation provided:

> No lien under [notice of written contract] shall avail as against a mortgage duly registered or recorded to the extent of amounts *actually advanced* (i) prior to the filing or recording of the notice of contract. . . .

Mass. Gen. Laws ch. 254, § 7(b) (2000) (emphasis added).

---

**10.** On April 3, 2006, this Court ordered the parties to brief the issue of whether the decisions in the Massachusetts District Court litigation or the Massachusetts State Court litigation had any preclusive effect in this action. The parties filed supplemental briefs on June 2, 2006. Defendant argued that Plaintiff was precluded, under the doctrine of collateral estoppel, from relitigating the issue of MARAD's obligation to pay Ahlborg under the Escrow Fund provisions of the Security Agreement as a result of the Massachusetts District Court's decision in the mechanics' lien litigation. In its supplemental brief, Plaintiff did not argue that the Massachusetts District Court decision had preclusive effect in this proceeding.

Rather, it argued that because the Massachusetts District Court stated that MARAD was contractually obligated to release funds upon MHI's written request for payment, and the Massachusetts Superior Court ordered MHI to pay Ahlborg $2,199,527 in damages, this Court should treat the Superior Court's order as the equivalent of a contractually required "written request" by MHI for release of monies from the Escrow Fund, thus authorizing payment to Ahlborg. However, Plaintiff has neither identified support in the record nor legal authority for treating a state court judgment against private entity as a "written request" for payment by such entity binding on the Government.

The District Court was called upon to determine whether funds were "actually advanced" when they were deposited by Fleet into the Escrow Fund or when they were released to Ahlborg by MARAD after authorization by MHI. Because Ahlborg filed its Notice of Contract in March 1998, over three months after MARAD's mortgage was recorded and Fleet made an "actual advance" of funds into the Escrow Fund in December 1997, the District Court held that MARAD's mortgage had priority over Ahlborg's later-filed mechanics' lien. In so ruling, the District Court rejected Ahlborg's argument that the funds were not "actually advanced" until MARAD, the mortgagee and guarantor, released the funds to Ahlborg. Dt. Ct. Opin. at 16–17. The District Court explained:

> To apply the reasoning of Ahlborg that the funds were not actually advanced until MARAD, the mortgagee and guarantor, released the funds would require a new application of the statute, which this court does not intend to do.

*Id.* at 17.

In the District Court proceeding, in addition to arguing that Ahlborg had priority under the Massachusetts Mechanics' Lien Statute, Plaintiff raised an equitable subordination theory. Under this theory, Ahlborg argued that MARAD engaged in unfair conduct when it refused to pay Ahlborg when the Independent Engineer issued its ruling and again when MARAD failed to release Escrow Funds in response to the Superior Court's Order awarding Ahlborg payment in accordance with the Independent Engineer's determination. Dt. Ct. Opin. at 20–22. Ahlborg argued that MARAD's seizure of the money in the Escrow Fund was unfair in light of the Security Agreement, the Consent of Contractor, and the Massachusetts Superior Court's determination that Ahlborg was entitled to the payment. Pl. Mem. for Sum. J. (D.Ct.) at 18–21, Attachment to Def.'s June 2, 2006 Supp. Mem. The District Court found that Ahlborg failed to provide an adequate basis to invoke the equitable subordination doctrine outside the bankruptcy context where it normally applies or the admiralty context where it may apply. The District Court recognized that the "bank-

ruptcy court is the proper forum to determine disputes regarding equitable subrogation" and declined to address the issue. Dt. Ct. Opin. at 22.

What complicates this matter is the District Court's dicta regarding the contracts at issue here, related in the context of rejecting Ahlborg's mechanics' lien claim. The Massachusetts District stated:

> Moreover, under the terms of the consent of contractor, Ahlborg agreed that MARAD had no obligation to pay any amount due to it under the construction contract. The consent of contractor, in pertinent part, reads: "secretary shall, by virtue of the security agreement, have no obligation or duty under the construction contract, and shall not be required to make to [Ahlborg] or to any other entity any payment due and owing by [MHI]...." Ahlborg argues that this provision must be read in conjunction with the security agreement, which provides that the Secretary, after written request from the [MHI], shall disburse funds directly to those entitled to any amount that the [MHI is] obligated to pay. The general rule, however, is "if the two contracting parties expressly provide that some third party who will be benefitted by performance shall have no legally enforceable right, the courts should effectuate the expressed intent by denying the third party any remedy." (citation omitted)

> Moreover, it is not entirely clear how the security agreement read in conjunction with the consent of contractor aids Ahlborg. The security agreement allows for MARAD to disburse funds from the account to those owed by [MHI] only after written request from [MHI]. A comparable situation presented itself in *Volpe Constr. Co., Inc. v. First National Bank of Boston,* [30 Mass.App.Ct. 249,] 567 N.E.2d 1244, 1248 (Mass.App.Ct.1991), where the general contractor attempted to establish third party beneficiary rights under the construction loan agreement by claiming that the bank made payments directly to the general contractor. These payments, similarly, were paid directly to the contractor only upon the consent of the borrower. The court, however, ultimately found this

argument ineffective in establishing any rights. (citation omitted).

There is nothing in the security agreement which would lead this court to conclude that MARAD, on its own, was obligated to or could make direct payments to Ahlborg. Direct payments were only allowed after written request from [MHI] acknowledging an obligation was due and owing. Dt. Ct. Opin. at 17–18.

 Under the doctrine of collateral estoppel, also known as issue preclusion, "a judgment on the merits in a first suit precludes litigation in a second suit of issues actually litigated and determined in the first suit." *In re Freeman*, 30 F.3d 1459, 1465 (Fed.Cir.1994). The underlying rationale for issue preclusion is that a party "who had litigated an issue and lost should be bound by that decision and cannot demand that the issue be decided over again." *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983) (*citing Warthen v. United States*, 157 Ct.Cl. 798, 800, 1962 WL 9259 (1962)) (other citations omitted). Issue preclusion is designed to "relieve the parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). Issue preclusion is warranted if the following factors are met:

(1) the issue in the second action is identical to the one decided in the first action;

(2) the issue was actually litigated in the first action;

(3) the resolution of the issue was essential to a final judgment in the first action; and

(4) the plaintiff had a full and fair opportunity to litigate the issue in the first action.

*Freeman*, 30 F.3d at 1465.

 Even assuming arguendo that prongs one, two and four have been met, Defendant has not demonstrated the requirements for prong three, *i.e.*, that the District Court's determination of a contractual issue—Ahlborg's rights under the Consent of Contractor and Security Agreement—was necessary to its judgment. In order for the Court to give preclusive effect to a particular finding, that finding must have been necessary to the judgment in the prior case. *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1538 (Fed.Cir.1995); *Mother's Restaurant*, 723 F.2d at 1571. The purpose of the requirement that a finding be necessary to the prior judgment is "to prevent the incidental or collateral determination of a nonessential issue from precluding reconsideration of that issue in later litigation." *Mother's Restaurant*, 723 F.2d at 1571.

Here, the District Court's conclusion that MARAD was not obligated to pay Ahlborg under the Security Agreement was a "collateral determination of a nonessential issue" to its holding that under the Massachusetts Mechanics' Lien Statute, MARAD's interest had priority over Ahlborg's interest because the loan funds had been "actually advanced" when deposited into the escrow account.[11] In reaching its holding, which was purely a matter of statutory construction of the term "actually advanced," the District Court had no need to analyze MARAD's obligations under the Security Agreement and Consent of Contractor. Rather, in a close analysis of Massachusetts Mechanics' Lien Statute, the Court reasoned that Fleet "actually advanced" the loan proceeds on the date these proceeds became available to MHI, not on the date the funds were released to Ahlborg, and thus that MARAD's mortgage was a prior recorded encumbrance, triggering the first-in-time, first-in-right rule. *Id.* at 16–17. Similarly, the resolution of Ahlborg's contractual rights was not essential to the District Court's determination that Ahlborg's equitable subrogation claim was properly resolved by a different forum, the Bankruptcy Court. Because District Court's statement that the Security Agreement did not provide Ahlborg any basis for recovery from MARAD was not essential to its determination that Ahlborg

---

11. Moreover, the District Court made this collateral determination outside the equitable subordination context where Ahlborg raised it.

was not entitled to relief under the mechanics' lien statute or principles of equitable subordination, the District Court's dicta has no preclusive effect here.

### *This Court Lacks Jurisdiction Over Plaintiff's Third–Party Beneficiary Claim*

Defendant seeks dismissal of Ahlborg's third-party beneficiary claim for lack of jurisdiction on the ground that Ahlborg lacked privity with the Government. When ruling on a motion to dismiss for lack of subject matter jurisdiction, a court must construe all undisputed factual allegations in favor of plaintiffs. *Cedars–Sinai Med. Ctr. v. Watkins,* 11 F.3d 1573, 1583 (Fed.Cir.1993). Nonetheless, plaintiffs bear the burden of establishing jurisdiction by a preponderance of the evidence. *Id.* at 1583; *see also Reynolds v. Army and Air Force Exchange Serv.,* 846 F.2d 746, 748 (Fed.Cir.1988). In finding the facts necessary for a determination of jurisdiction "a court is not restricted to the face of the pleadings, but may review evidence extrinsic to the pleadings, including affidavits and deposition testimony." *Cedars–Sinai,* 11 F.3d at 1584; *see also Reynolds,* 846 F.2d at 747 ("If a motion for lack of subject matter jurisdiction, however, challenges the truth of the jurisdictional facts alleged in the complaint, the district court may consider relevant evidence in order to resolve the factual dispute.").

▮▮▮ The Tucker Act authorizes the Court of Federal Claims to hear any claim founded upon an express or implied-in-fact contract with the United States. 28 U.S.C. § 1491(a)(1). The Federal Circuit has stated that "to maintain a cause of action pursuant to the Tucker Act that is based on a contract, the contract must be between the plaintiff and the Government." *Cienega Gardens v. United States,* 194 F.3d 1231, 1239 (Fed.Cir. 1998) (internal citation omitted). Stated differently, there must be privity of contract between the plaintiff and the United States. *See Chancellor Manor v. United States,* 331 F.3d 891, 899 (Fed.Cir.2003) (noting longstanding rule that privity is required in contract cases under the Tucker Act); *Cienega,* 194 F.3d at 1239; *Central Transport Intern., LLC v. U.S.,* 63 Fed.Cl. 336, 338 (2004), *aff'd,* 161 Fed.Appx. 952 (Jan. 9, 2006); *Globex*

*Corp. v. United States,* 54 Fed.Cl. 343, 347 (2002); *Martinez v. United States,* 48 Fed.Cl. 851, 860 (2001), *aff'd,* 281 F.3d 1376 (Fed.Cir. 2002), *reh'g denied,* 281 F.3d 1376 (Fed.Cir. 2002). A finding of privity between the Plaintiff and the Government "is a jurisdictional prerequisite for a contract claim because 'the government consents to be sued only by those with whom it has privity of contract.'" *Globex,* 54 Fed.Cl. at 347 (*citing Erickson Air Crane Co. v. United States,* 731 F.2d 810, 813 (Fed.Cir.1984)). Absent privity between Plaintiff and the United States, there has been no waiver of sovereign immunity for a suit in contract. *Central Transport,* 63 Fed.Cl. at 338.

▮▮▮ As a general rule, subcontractors to a prime contractor holding a Government contract lack privity with the Government. *Flexfab v. United States,* 424 F.3d 1254, 1263 (Fed.Cir.2005); *W.G. Yates & Sons Constr. Co. v. Caldera,* 192 F.3d 987, 990–91 (Fed. Cir.1999). However, an exception to this general rule has been applied when the subcontractor is determined to be a third-party beneficiary under the contract. *Flexfab,* 424 F.3d at 1263. The third-party beneficiary exception exists to cover situations in which the subcontractor "stands in the shoes of a party with privity." *First Hartford Corp. Pension Plan & Trust v. United States,* 194 F.3d 1279, 1289 (Fed.Cir.1999).

Plaintiff alleges that MARAD and MHI intended, and that Plaintiff expected to be, a beneficiary to the Security Agreement. Pl. Mot. at 20–22. Plaintiff claims that its third-party beneficiary status is derived from the Security Agreement's Escrow Fund provision because it specifically identified Plaintiff and because the Security Agreement was incorporated into the Consent of Contractor. *See* Security Agreement § 5.02(b) (requiring MARAD to release payment from the escrow account directly to contractors of MHI upon receiving written notice from MHI).

▮▮▮ As the Federal Circuit has recognized, "third-party beneficiary status is an 'exceptional privilege.'" *Chancellor Manor,* 331 F.3d at 901 (quoting *Glass v. United States,* 258 F.3d 1349, 1354, *amended on reh'g* 273 F.3d 1072 (Fed.Cir.2001)). A party

must be an intended beneficiary of an agreement to qualify as a third-party beneficiary. *Chancellor Manor*, 331 F.3d at 901; *see also Flexfab*, 424 F.3d at 1260 ("it is sufficient to ask in the typical case whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him."); *Maher v. United States*, 314 F.3d 600, 606 (Fed.Cir.2002) (requiring a litigant to show that the parties entering into the relevant agreement intended the litigant to benefit directly from the agreement); *Glass*, 258 F.3d at 1354–55 (holding that the plaintiff-shareholders did not qualify as third-party beneficiaries because they did not stand to benefit directly from the contract in question); *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352 (Fed.Cir.2001).

▆▆▆▆ Plaintiff's claim that it is an intended beneficiary under the Security Agreement fails for several reasons. First, the Security Agreement stated that MARAD and MHI were the only beneficiaries of the agreement. The Agreement provided: "[t]his Security Agreement is for the sole benefit of [MHI], the Secretary and their respective successors and assigns, and no other Person shall have any right hereunder." Secondly, the Consent of Contractor made it clear that MARAD did not assume any obligation to Plaintiff, stating: "The Secretary shall, by virtue of the Security Agreement, have no obligation or duty under the Construction Contract, and shall not be required to make to [Ahlborg] or to any other entity any payment due and owing by [MHI] under the Construction Contract." Consent of Contractor at 2.a. A party cannot be an intended beneficiary when the parties have agreed to the contrary. *See Sindram v. United States*, 67 Fed.Cl. 788, 793–94 (2005) (nonparty could not attain third-party benefi-

ciary status where contract contained provision excluding third-party rights); RESTATEMENT (SECOND) OF CONTRACTS § 302 (1981) ("*Unless otherwise agreed* between promisor and promisee, a beneficiary of a promise is an intended beneficiary.") (emphasis added).[12]

▆▆▆▆ Third, contrary to its claims, Plaintiff does not attain third-party beneficiary status as a creditor beneficiary. The rights and status of a creditor beneficiary were explained by the Federal Circuit in *D & H Distributing Co. v. United States*, 102 F.3d 542, 546–47 (Fed.Cir.1996):

> In the case of a contract in which the promisee provides goods or services to the promisor, it has long been settled that a clause providing for the promisor to pay the proceeds of the contract to a third party is enforceable by the third party where the payment is intended to satisfy a present or future liability of the promisee to the third party. The third party beneficiary in that situation has traditionally been referred to as a 'creditor beneficiary' and has been accorded full rights to sue under the original contract.

*See also, JGB Enterprises v. United States*, 63 Fed.Cl. 319, 332 (2004); *Norwest Bank Arizona, N.A. v. United States*, 37 Fed.Cl. 605, 608–09 (1997).

Plaintiff contends that it is a creditor beneficiary because the Escrow Fund provisions of the Security Agreement were designed to ensure payment to MHI's contractors on the Project, including Ahlborg. In *D & H*, the Federal Circuit held that a subcontractor qualified as a third-party beneficiary because the Government modified its contract to make the subcontractor a co-recipient of pay-

---

**12.** Plaintiff also relies on the statutory framework of Title XI to claim that it was an intended beneficiary of the Security Agreement. Specifically, Plaintiff claims that its integral role in achieving the purpose of Title XI, to reactivate closed shipyards in order to renew the United States' maritime leadership, made it an intended beneficiary of that agreement. Pl.'s Motion at 20–21. A governing statute may shed light on whether a contract implementing such statute confers third-party beneficiary status. *See Roedler*, 255 F.3d at 1352 ("Where the intent to benefit the third party is not expressly stated in

the contract, evidence thereof may be adduced ... when, as here, the contract implements a statutory enactment, it is appropriate to inquire into the governing statute and its purpose.") However, there is nothing in Title XI which shows an intent to benefit the construction contractor refurbishing a shipyard. 46 App. U.S.C. § 1271 *et seq.; see Roedler*, 255 F.3d at 1352–53; *see also, Chancellor Manor*, 331 F.3d at 897–901 (finding that the HUD statutory program was for the benefit of housing tenants and not property owners).

ment along with the prime contractor. *D & H*, 102 F.3d at 547. Both the contractor and the subcontractor were listed as joint payees. *Id.* at 544. The court in *D & H* recognized that the "entire purpose of this joint payment clause was to provide protection for D & H by giving it a right to control the disbursement of the contract proceeds and thereby ensure that its invoice to CIM would be paid." 102 F.3d at 547. Similarly, in *Norwest Bank*, a subcontractor had third-party beneficiary status entitling it to bring suit when the prime contractor and the Government had agreed to modify the contract to name the subcontractor's bank as payee under the contract. 37 Fed.Cl. at 609. Thus, in *D & H* and *Norwest Bank*, contract payment modifications were granted in order to protect plaintiffs' interests.

The present case is readily distinguishable from these cases. The Security Agreement did not afford any protection to Ahlborg, since by its terms that agreement was solely and exclusively for the benefit of MARAD and MHI. The Escrow Fund provisions of the Security Agreement did not provide Ahlborg with any right to control the disbursement of the monies from the Escrow Fund, and no evidence suggests that the reason for the direct payment provision was to benefit Ahlborg. Moreover, the Consent of Contractor provided that MARAD had no obligation to pay Ahlborg under the Construction Contract.

Further, contrary to Plaintiff's argument, MARAD's involvement in negotiating the contracts here and its oversight of the project are insufficient to establish contractual privity between the Government and Ahlborg. In *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1552 (Fed.Cir.1983), the Federal Circuit recognized that privity of contract between the Government and a subcontractor does not result from the Government's maintenance of inspectors at the prime and subcontractors' job site, coupled with its authority to reject work that failed to comply with contractual requirements and its ability to approve or reject the prime contractor's agreements with each subcontractor. *See also Cienega Gardens*, 194 F.3d at 1245 ("the degree of [Government] involve-

ment with a project does not create privity so as to allow suit against the government."). In sum, Plaintiff has not established that it had privity of contract with the Government, and its third-party beneficiary claim must be dismissed.

### Plaintiff Has Failed to Establish the Existence of an Implied–in–Fact Contract

Plaintiff offers several theories supporting the existence of an implied-in-fact contract requiring the Government to pay Ahlborg for its work on the Shipyard. First, Plaintiff alleges that "the express incorporation of the Escrow Fund provisions of the Security Agreement into the Construction Contract and Consent of Contractor establish an implied-in-fact contract between Ahlborg and MARAD." Pl's Resp. to January 5, 2005 Order. Second, Plaintiff alleges that "an implied-in-fact contract was created by the very establishment of the Escrow Fund provisions of the Security Agreement." Pl.'s Mot. at 17. Third, Plaintiff alleges that the course of conduct around the time of a "material Project default" establishes the existence of an implied-in-fact contract. Pl.'s Mot. at 19; Tr., June 17, 2005, at 48–49. The parties have filed cross-motions for summary judgment on this implied contract claim.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making a determination as to whether summary judgment is appropriate, a court does not weigh the evidence to determine the truth of the matter, but rather assesses whether there is a genuine issue for trial. *Id.* at 249, 106 S.Ct. 2505. The movant bears the initial burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant then bears the burden of showing sufficient evidence of a material fact in dispute that would allow a fact finder to decide the case in its favor. *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. 2505. If such evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at

249–50, 106 S.Ct. 2505. When considering the existence of a genuine issue of material fact, a court must draw all inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When considering cross-motions for summary judgment, courts evaluate each motion on its own merits and resolve any reasonable inferences against the moving party. *Mingus Constructors, Inc. v. U.S.*, 812 F.2d 1387, 1390–91 (Fed.Cir.1987). If genuine disputes exist over material facts, both motions must be denied. *Id.*

In order to establish an implied-in-fact contract, a party must prove the same requirements governing formation of an express contract with the Government: mutuality of intent to contract; consideration; an unambiguous offer and acceptance; and actual authority to bind the government. *Trauma Serv. Group v. United States*, 104 F.3d 1321, 1325 (Fed.Cir.1997); *Harbert/Lummus Agrifuels Projects v. United States*, 142 F.3d 1429, 1432 (Fed.Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1111, 143 L.Ed.2d 107 (1999); *Northrop Grumman Corp. v. United States*, 46 Fed.Cl. 622, 624 (2000); *LaMirage, Inc. v. United States*, 44 Fed.Cl. 192, 197 (1999). Moreover, an implied-in-fact contract "is one founded upon a meeting of minds and 'is inferred, as a fact, from the conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" *Hanlin v. United States*, 316 F.3d 1325, 1328 (Fed.Cir.2003) (*quoting Balt. & Ohio R.R. v. United States*, 261 U.S. 592, 597, 58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)). An implied-in-fact contract cannot exist where an express contract between the two parties on the same subject matter exists. *Roedler*, 255 F.3d at 1353; *Trauma Serv. Group*, 104 F.3d at 1325.

The incorporation of the Escrow Fund provisions of the Security Agreement into the Construction Contract and Consent of Contractor do not establish an implied-in-fact contract requiring MARAD to pay Ahlborg for its work on the Shipyard. Nor was such an implied-in-fact contract created by the establishment of the Escrow Fund provisions of the Security Agreement. To establish an implied-in-fact contract, Plaintiff must establish "an unambiguous offer to contract upon specific terms, an unambiguous acceptance of that offer, and an intent to contract." *LaMirage, Inc.*, 44 Fed.Cl. at 197. Here, MARAD did not manifest an intent to contract because MARAD was neither required nor permitted to pay Plaintiff from the Escrow Fund in the absence of a request by MHI to release funds from the escrow account, and MHI never made such a request. The Security Agreement merely set out the way in which money would be disbursed from the Escrow Fund by MARAD upon request of MHI—it did not otherwise impose any obligation upon MARAD. Under the Security Agreement, MARAD did not make a promise to Ahlborg to satisfy MHI's obligations without a written request from MHI.

Nor has Ahlborg established a course of conduct suggesting that MARAD could, or was required to pay, Ahlborg without MHI's imprimatur. Without evidence that a new contractual process was established for paying Plaintiff, the method in which payments would have been processed—requiring MHI's approval before payment could be made—remained full force.[13]

Accordingly, Plaintiff has not established an implied-in-fact contract with the Government requiring MARAD to pay Ahlborg for its work on the Shipyard.[14]

---

13. Plaintiff further argues that the parties' course of conduct gave rise to an implied contract providing that MARAD would be liable for MHI's obligations to Plaintiff after MHI's default due to Plaintiff's extension of the cure period. The Court disagrees. Plaintiff has provided no evidence that, in exchange for Ahlborg's extending the right to cure period and delaying the termination of the Construction Contract, MARAD promised that it would release payment from the Escrow Fund.

14. Plaintiff alleged two additional implied-in-fact contract theories in its complaint. First, it alleges that MARAD had a contractual obligation to Ahlborg to "ensure the implementation and maintenance of certain project cost, equity, and working capital requirements in order to ensure that the project was completed and all stakeholders paid." Compl. ¶ 114. Plaintiff alleged that MARAD breached this obligation because it "failed to adhere to the conditions for disbursements from the payment funds, failed to comply

## CONCLUSION

Defendant's Motion to Dismiss Plaintiff's third-party beneficiary claim for lack of subject matter jurisdiction is **GRANTED**.

Defendant's Motion for Summary Judgment as to Plaintiff's implied-in-fact contract claim is **GRANTED**. Plaintiff's Motion for Partial Summary Judgment is **DENIED**. The Clerk of the Court is directed to dismiss this action. No costs.

with its obligation to ensure the viability of the project, and induced Ahlborg to loan money to the Project at a time when MARAD knew that the project was in jeopardy." *Id.* Second, Plaintiff alleged that MARAD had a "contractual obligation" to Ahlborg "to review and approve MHI's technical plans or ensure the viability of MHI's project." Compl. ¶¶ 122–23. According to this theory, MARAD breached these obligations when it failed to review a major design change of the Project so as to ensure the technical and economic viability of the project in order to be able to pay Ahlborg for its work. *Id.* ¶ 123. Plaintiff has not offered any evidence supporting such agreements and appears to have abandoned these theories of an implied-in-fact contract.