# United States Court of Appeals for the Federal Circuit

---

**CALLAWAY MANOR APARTMENTS, LTD., FOX GARDEN APARTMENTS, LTD., FOX MANOR APARTMENTS, LTD., LAKE GARDEN APARTMENTS, LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1926

---

Appeal from the United States Court of Federal Claims in Nos. 1:14-cv-00332-EGB, 1:14-cv-00333-EGB, 1:14-cv-00334-EGB, 1:14-cv-00335-EGB, Senior Judge Eric G. Bruggink.

---

Decided: October 2, 2019

---

MARK BLANDO, Eckland & Blando LLP, Minneapolis, MN, argued for plaintiffs-appellants. Also represented by JEFF HOWARD ECKLAND, VINCE REUTER, LARA SANDBERG; WILLIAM LEWIS ROBERTS, Faegre Baker Daniels LLP, Minneapolis, MN.

GEOFFREY MARTIN LONG, Commercial Litigation Branch, Civil Division, United States Department of

Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, ROBERT EDWARD KIRSCHMAN, JR., FRANKLIN E. WHITE, JR.

_____

Before O'MALLEY, LINN, and HUGHES, *Circuit Judges.*

Opinion for the court filed by *Circuit Judge* O'MALLEY.

Opinion concurring-in-part and dissenting-in-part filed by *Circuit Judge* HUGHES.

O'MALLEY, *Circuit Judge.*

Appellants Callaway Manor Apartments, Fox Garden Apartments, Fox Manor Apartments, and Lake Garden Apartments (collectively, "Appellants") appeal from a decision of the United States Court of Federal Claims ("Claims Court") granting the government's motion for summary judgment on certain breach of contract and takings claims. *Callaway Manor Apartments, Ltd. v. United States*, 136 Fed. Cl. 313 (2018). We find that the Claims Court improperly applied the law on the first issue and did so, in part, with respect to the second issue. Therefore, we reverse-in-part, vacate-in-part, affirm-in-part, and remand.

## I. BACKGROUND

### A. The Asserted Contracts

Between 1983 and 1984, Appellants each entered into identical loan arrangements with the Farmers Home Administration ("FmHA") of the United States Department of Agriculture. Under the loan arrangements, FmHA issued Appellants mortgage loans in exchange for Appellants providing housing for low-income tenants during the life of the loans (50 years) under Section 515 of the Housing Act of 1949, 42 U.S.C. §§ 1485, 1490a.

The loan arrangements consisted of three contemporaneously executed documents: a loan agreement, promissory note, and mortgage. Together, the parties labeled these

three documents the "loan obligation." J.A. 32 ("The indebtedness and other obligations of the Partnership under the [promissory] note evidencing the loan, the related security instrument[,] and [any] related agreement are herein called the 'loan obligation.'").

The loan agreement described the terms of the loan, reciting that FmHA would provide a loan to Appellants in exchange for Appellants abiding by certain restrictions on use of the property prescribed by § 515. J.A. 32–34.[1] The promissory note, issued under a 50-year term, detailed the amount of the debt and terms of payment, including providing that the "[p]repayment[] of scheduled installments, or any portion thereof, may be made at any time at the option of the Borrower." J.A. 40–41. Finally, the mortgage—which noted that the loan must be used in compliance with § 515 and FmHA regulations—recited an additional use restriction that required Appellants to use the property for low-income § 515 housing for 20 years before they could prepay the loan and exit the § 515 program. J.A. 4, 35, 39.

In addition to being contemporaneously executed and pertaining to the same set of facts, the three documents also cite to each other. For example, the mortgage referenced the promissory note and expressly incorporated by reference the loan agreement. J.A. 4, 39. And, the loan agreement incorporated by reference both the promissory note and mortgage. J.A. 4, 32.

It is undisputed that, under the loan obligation and the FmHA regulations at the time the parties entered the arrangement, Appellants were required to use the loan for

---

[1] The parties agree that the terms of the loan agreements, promissory notes, and mortgages are identical among all Appellants. Appellant Br. 3 n.1; Government Br. 6. We, therefore, cite to instruments only between Callaway Manor and the Government for simplicity.

§ 515 housing for a minimum of 20 years. But the moment the 20-year restrictive use period expired, Appellants could prepay the remaining balance on the loan, exit the program, and terminate the requirement of using their property for § 515 housing.  *See* Appellant Br. 4; Government Br. 4.

## B.  Enactment of ELIHPA and HCDA

Before Appellants' 20-year restrictive use period ended, Congress, concerned with the vitality of the § 515 program due to the number of borrowers exercising their prepayment options, enacted the Emergency Low Income Housing Preservation Act of 1987, Pub. L. No. 100-242, 101 Stat. 1877 (1988) ("ELIHPA") and the Housing and Community Development Act of 1992, Pub. L. No. 102-550, 106 Stat. 3672 (1992) ("HCDA").

Under ELIHPA and HCDA, regardless of the terms of any loan agreement, the borrower may no longer prepay loan installments at any time after the 20-year restrictive use period ends.  The borrower, rather, must file a notice of intent to prepay the loan, to which the Department of Agriculture's Office of Rural Development and its agency, the Rural Housing Service (FmHA's successor), must respond by "mak[ing] reasonable efforts to enter into an agreement with the borrower . . . to extend the low income use of the assisted housing."  42 U.S.C. § 1472(c)(4)(A) (2012).  For example, Rural Development may offer the borrower incentives to remain in the low-income housing program, including, e.g., reduced interest rates or rental assistance.  42 U.S.C. § 1472(c)(4)(B) (2012); 7 C.F.R. § 3560.656.  If the borrower rejects these incentives or the agreement is not extended, the borrower must attempt to sell the property at fair market value to either a nonprofit organization or a public agency.  42 U.S.C. § 1472(c)(5)(A)(i); 7 C.F.R. § 3560.658.  Finally, if a sale is not completed within 180 days from that point, the borrower may prepay the loan without any further restrictions.  42 U.S.C.

§ 1472(c)(5)(A)(ii); 7 C.F.R. § 3560.659(k); *see also* Rural Development Multifamily Housing Project Servicing Handbook, HB-3-3560, Chapter 15.31 (requiring the Loan Servicer to "[s]end a letter to the borrower notifying him or her that prepayment is permitted" if no sale is completed within the 180-day period).

As relevant here, because of the enactment of ELIHPA and HCDA, Appellants could not automatically prepay their loan at the end of the 20-year restrictive use period like their loan obligations had permitted. Appellants, rather, were required to follow the procedure outlined above before they were given the option to prepay the loan and be released from the § 515 restrictions.

## C. Appellants' Restrictive Use Period Ends

Appellants' 20-year restrictive use period ended in 2003 and 2004, but Appellants did not attempt to exercise their right of prepayment until 2008. Specifically, on February 28, 2008, Rural Development sent Appellants written notice expressing concern about the economic viability of their properties. J.A. 59, 138, 203, 271. In response, Appellants submitted prepayment requests, received by Rural Development on April 28, 2008, expressing their desire to prepay their respective loans by December 1, 2008. J.A. 6, 65–66, 142–43, 207–08, 275–76.

Consistent with the requirements of ELIHPA and HCDA, Rural Development offered Appellants incentives to keep the properties in the § 515 housing program. J.A. 328, 338–39. Appellants rejected the incentive offers and, in 2009 through 2010, marketed their properties for the required 180-day period but were ultimately unable to sell the properties. J.A. 6. At this point, it is undisputed that Appellants satisfied the ELIHPA and HCDA requirements and could have prepaid the loans to be released of the restrictive use requirements.

In September 2010, facing foreclosure of their properties and having difficulty maintaining occupancy due to "high unemployment and loss of jobs in the area," Appellants requested that Rural Development allow them to offer deeds in lieu of foreclosure. *See* J.A. 70–71, 153–54, 211–12, 279–80. In February 2011, Rural Development informed Appellants that, due to their violation of the loan agreement for various reasons including non-payment of debt, their debt to the Government would be accelerated. J.A. 72–74, 155–57, 213–15, 281–83. Appellants thus offered Rural Development their deeds in lieu of foreclosure on May 18, 2011, which Rural Development accepted in November 2011. J.A. 115, 180, 247, 314. Appellants officially transferred the deeds to Rural Development on August 1, 2012. J.A. 7.

The accepted deed offers included multiple enclosures, including Form RD 3560-22, "Offer to Convey Security," (hereinafter, the "Offer") which stated:

> I. We hereby offer to convey to the United States of America, acting through the Rural Housing Service . . . our property covered by mortgages, deeds of trust, or other security instruments held or insured by the Agency[] in full satisfaction of debt.
>
> * * *
>
> IV. At closing the following will be assigned to the Agency: . . . (4) all our rights, title, and interest in all contract rights, inventories, equipment, furnishings, accounts, general intangibles, gross receipts, gifts, pledges, income, and revenue as described in security instruments held or insured by the Agency.

J.A. 90, 159, 226, 293. This Offer language is central to the parties' breach of contract claims.

### D. Procedural History

On April 22, 2014, Appellants each sued the Government in the Claims Court for breach of contract or, in the alternative, a taking in violation of the Fifth Amendment based on the Government's failure to permit Appellants to prepay their debt once the 20-year restrictive period ended. Appellants' cases were consolidated on April 15, 2016. On February 21, 2017, the Government moved to dismiss Appellants' breach of contract claim under Rule 12(b)(1) and moved for judgment on the pleadings as to Appellants' takings claim. First, the Government argued that Appellants lacked standing to bring the breach of contract claim because, in executing the deeds in lieu of foreclosure, Appellants assigned the right to sue for breach of the prepayment right to the Government and, thus, could not demonstrate any redressable injury. Second, the Government argued that, even assuming interference with Appellants' contract rights, the Government's action could not constitute a taking because it was acting in a proprietary, not sovereign, capacity.

On August 8, 2017, the Claims Court converted the Government's motion to dismiss to one for summary judgment and directed the parties to submit proposed findings of fact. On February 28, 2018, the Claims Court granted the Government's motion. *Callaway Manor*, 136 Fed. Cl. at 315.

First, regarding the breach of contract claim, the Claims Court relied on *Dominion Res., Inc. v. United States*, 641 F.3d 1359, in holding that, "[a]n assignment may be effective to transfer the right to bring a claim for damages resulting from breach of a contract, because the rights of a party to a contract encompass not just the party's continuing rights and duties under the contract, but also the party's existing right to enforce the contract for an ongoing breach and to collect damages that have been incurred." *Callaway Manor*, 136 Fed. Cl. at 318 (internal

quotation marks omitted). And, here, the Claims Court found that the loan agreement, promissory note, and mortgage were "all of one piece." *Id.* at 320. The court thus concluded that the reference in the Offer to "all our rights . . . in all contract rights . . . described in the security instruments" "clearly incorporate[d] the contract rights set out in the [promissory] note"—namely, the right to prepayment. *Id.* Accordingly, when Appellants assigned their contract rights to the Government, "the prepayment right was no longer enforceable." *Id.* The contemporaneous circumstances, according to the Claims Court, supported this outcome. The court explained that the events surrounding Appellants' assignment established that Appellants "sought a clean exit from the program" and "did so without carving out the right to later bring a breach of contract claim." *Id.* at 319–20. The court, therefore, concluded that Appellants lacked standing to bring the breach of contract claim and granted summary judgment on this issue in favor of the Government. *Id.* at 320.

Second, regarding the takings claim, Appellants presented two theories, one based on the Government's breach of the prepayment right and one based on a regulatory taking based on enactment of ELIHPA and HCDA. As to the former, the court held that a takings claim may only result from a contractual breach when the Government prevents performance of the contract and substantially takes away the right to damages. *Id.* But, here, while ELIHPA and HCDA prevented Appellants from prepaying their loans at the 20-year mark, the Government did not deprive Appellants of the right to sue for breach of contract. The court emphasized that "[t]he fact that [Appellants] chose to transfer the properties and associated contract rights to the government after they placed the government in breach does not create a taking." *Id.* The court also rejected Appellants' regulatory taking theory, explaining that the additional burdens imposed by ELIHPA and HCDA were the

result of the Government's contract breach and, thus, could not constitute the basis of a takings claim. *Id.* at 321.

Appellants timely filed the instant appeal on April 27, 2018, arguing that they did not assign the Government their accrued claims for breach of contract and that they properly pleaded an alternative takings claim. For the reasons below, we agree with Appellants on both issues. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

All issues presented in this appeal—standing, contract interpretation, and whether a taking has occurred—are questions of law that we review de novo. *See Castle v. United States*, 301 F.3d 1328, 1337 (Fed. Cir. 2002); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004); *Barlow & Haun, Inc. v. United States*, 805 F.3d 1049, 1054 (Fed. Cir. 2015). We review any underlying fact findings for clear error. *CliniComp Int'l, Inc. v. United States*, 904 F.3d 1353, 1357 (Fed. Cir. 2018). Summary judgment, moreover, "is, of course, in all respects reviewed de novo." *Cienega Gardens v. United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).

## A. Contract Claim

The Tucker Act grants the Claims Court jurisdiction over "any claim against the United States founded . . . upon any express or implied contract with the United States." 28 U.S.C. § 1491(a)(1). On appeal, the Government argues that Appellants lack Article III standing to assert their contract claim. To establish standing, a plaintiff must show that it suffered an injury in fact that is causally connected to the conduct complained of and redressable by court action. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). According to the Government, Appellants have no legal right to enforce their breach of contract claim—and thus cannot establish a redressable injury—because they assigned their prior accrued claims for breach

of contract to the Government when they transferred their deeds with the Offer.

Appellants contend that, in transferring their deeds to the Government with the Offer, they did not assign away their accrued claims for breach of the prepayment right and, thus, retain standing to pursue this claim. According to Appellants, the Claims Court erroneously applied *Dominion* in determining whether the Offer included an assignment of Appellants' prior accrued contract rights of action. Under a proper reading of *Dominion* and our prior caselaw, Appellants contend that no express or implied assignment of accrued rights occurred here. We agree with Appellants.

Before addressing *Dominion*, we must address an earlier case, *Ginsberg v. Austin*, 968 F.2d 1198 (Fed. Cir. 1992), in which we articulated the standard for determining whether an assignment incorporates prior accrued claims. In *Ginsberg*, a landlord leased space in a building to a government tenant. During the holdover period following the lease's termination date, the landlord sold the building to a third party. Under the sales contract, the landlord assigned to the third party "all of [his] right, title and interest in, to and under the Tenant Leases . . . ." *Ginsberg*, 968 F.2d at 1199. The day before the sale closed, the landlord filed a claim with the contracting officer for additional rent incurred by the government's holdover. The contracting officer dismissed the landlord's claims for lack of standing, and the landlord appealed to the Board of Contract Appeals. The Board affirmed the contracting officer's determination, explaining that the landlord's contract with the third party was "an unqualified transfer to [the third party] of all right, title, claim and interest in the lease, including claims for back rent." *Id.* at 1200. As such, the landlord was no longer in privity with the government and lacked standing to make any claim against it.

On appeal to our court, we reversed. We explained that the Board's decision—based on "the purely legal determination that upon transfer of real property, all rights to back rent are transferred to the assignee unless those rights are expressly reserved to the assignor"—was an error of law. *Id.* Noting that federal law was not dispositive of the issue, we turned to general property and contract law principles, explaining that, in both contexts, "uniform and long-standing legal authority" dictates that accrued claims are not transferred with an assignment unless expressly stated. *Id.* at 1200–02 (first citing *Shell Petroleum Corp. v. Jackson*, 77 F.2d 340, 342 (6th Cir. 1935) ("[I]t is well settled that in the absence of an express intention to do so, an assignment of a reversionary interest in a lease will not cover rent already accrued."); and then citing *Nat'l Reserve Co. of Am. v. Metro. Tr. Co. of Cal.*, 17 Cal. 2d 827, 833 (1941) ("[U]nless an assignment specifically or impliedly designates them, accrued causes of action arising out of an assigned contract . . . do not pass under the assignment as incidental to the contract if they can be asserted by the assignor independently of his continued ownership of the contract and are not essential to a continued enforcement of the contract.")). Accordingly, we concluded that, because the landlord did not expressly state that he was transferring his back-rent claim in the contract to the third party, he retained his accrued claims and possessed the requisite standing to pursue them on the merits. *Id.* at 1202.

Almost twenty years later, in *Dominion*, we again considered the relationship between an assignment of contract rights and prior accrued claims in the context of an assignment of contracts for disposal of spent nuclear fuel entered into under the Nuclear Waste Policy Act ("NWPA"), 42 U.S.C. § 10222(b)(3). Under the NWPA, the United States Department of Energy may enter into contracts with utility companies for the disposal of the utilities' high-level nuclear waste and spent nuclear fuel. As relevant in *Dominion*, one such utility company entered into three contracts

with the Department of Energy and, later, sold its nuclear power plants to a third party and assigned that third party its contracts with the government. 641 F.3d at 1361. The assignment provided that the utility company transferred to the third party, along with title to the spent nuclear fuel, "all rights of the Sellers . . . under the [Department of Energy] Standard Contracts (including all rights to any claims of Sellers related to DOE defaults thereunder)." *Id.*

The third party ultimately sued the government in the Court of Federal Claims for interim storage costs, including costs incurred by the original utility company prior to the assignment. The Claims Court ruled in favor of the third party, awarding it costs including those incurred by the original utility company. On appeal to our court, the government argued that the third party was not entitled to sue for the originally incurred costs, not because the assignment did not expressly include a transfer of accrued claims, but because such a transfer under the NWPA was barred by the Assignment of Claims Act. *Id.* at 1361. According to the government, Congress was required under *Ginsberg* to expressly waive the Assignment of Claims Act as to existing breach of contract claims for such a transfer to be valid. That is, it was undisputed that the assignment expressly included any prior accrued claims because the assignment included the clause, "including all rights to any claims of Sellers." *Dominion*, 641 F.3d at 1361. And, the court found it undisputed that "both parties clearly intended for the sale to include the transfer of the claim against the government." *Id.* The only issue for our court, therefore, was whether a transfer of prior accrued claims was permitted under the NWPA and the Assignment of Claims Act. *Id.* at 1362.

We determined that such an assignment was permitted because the NWPA included language that "'[t]he rights and duties of a party to a contract entered into under this section may be assignable'" and "[o]ne of the rights of a party to a contract is the right to bring a claim for damages

resulting from breach." *Id.* at 1362–63 (quoting 42 U.S.C. § 10222(b)(3)). Notably, in reaching our conclusion that Congress permitted the assignment of accrued claims based on the language of the NWPA, we emphasized that our ruling was "not to the contrary" of *Ginsberg*. *Id.* at 1363. We explained that, "*Ginsberg* recite[d] no requirement that the transfer of an existing breach of contract cause of action requires a separate, specific, express designation of the claim in the assignment document" and, rather, "a contract assignment may 'specifically or impliedly designate' accrued causes of action." *Id.* (quoting *Ginsberg*, 968 F.2d at 1201). And, here, the NWPA's "may be assignable" language "permitted just such a designation." *Id.* Finally, having determined that the assignment was permitted, and because "[t]his [wa]s not a case where there [wa]s any confusion over whether the parties intended to transfer the right to sue for pre-acquisition interim storage fees—it [wa]s undisputed that they did[,]" we held that the third party had the right to collect pre-assignment damages. *Id.*

Together, *Ginsberg* and *Dominion* establish that a contract assignment does not automatically transfer prior accrued claims stemming from that contract, but that any such assignment may include prior accrued claims, specifically or impliedly. Here, the assignment did not include Appellants' prior accrued claims for breach of contract.

The language at issue stems from the Offer, which provides that Appellants assigned "all [their] rights, title, and interest in all contract rights . . . as described in security instruments." It is undisputed that an assignment of accrued claims is permitted under Appellants' contracts with the government. *See* Appellant Reply Br. 6. But merely because such an assignment was permitted does not signify that those accrued claims were actually included within the assignment. *See Dominion*, 641 F.3d at 1363. That is, in both *Ginsberg* and *Dominion*, we required more than

simply the fact that an assignment of accrued claims was *allowed* to find that they were transferred.

In *Ginsberg*, we required an "express" intention to transfer prior accrued claims, 968 F.2d at 1202, and in *Dominion*, it was undisputed that, based on both the language of the assignment and the parties' intentions, the prior accrued claims were transferred, 641 F.3d at 1363. And, through *Ginsberg* and *Dominion*, we provided examples of language that does and does not include an assignment of prior accrued claims. First, in *Ginsberg*, we found the language "Assignor hereby assigns to Assignee all of its right, title and interest in, to and under the Tenant Leases" insufficient to include an assignment of prior accrued claims. 968 F.2d at 1199. Then, in *Dominion*, we found the transfer of "all rights of the Sellers . . . under the DOE Standard Contracts (including all rights to any claims of Sellers related to DOE defaults thereunder)" was sufficient to include a transfer of prior accrued claims. 641 F.3d at 1361.

The Offer language at issue here is nearly identical to that at issue in *Ginsberg*. Compare J.A. 90 (Offer language, "all our rights, title, and interest in all contract rights . . . as described in security instruments"), with *Ginsberg*, 968 F.2d at 1199 ("all of its right, title and interest in, to and under the Tenant Leases"). Despite the Government's arguments raised for the first time during oral argument surrounding the temporal distinctions in *Ginsberg*—*i.e.*, that the assignment language there indicated that the assignment took effect on December 23, 1986, and the assignor filed a certified claim for backpay against the government the day earlier—we relied on no such distinction in concluding that the language at issue was insufficient to encompass prior accrued claims.

And, contrary to the language found to include prior accrued claims in *Dominion*, the Offer does not include any language related to the Appellants' "claims," or any other type of waiver or release, as the Government conceded

during oral argument.  Oral Argument at 15:25, *Callaway Manor v. United States* (No. 18-1926), http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2018-1926.mp3 (Q: "There is no statement of release, the word release appears nowhere, there's no waiver, there's nothing of that sort." A: "That's correct, your Honor.").

Even reading the loan agreement, promissory note, and mortgage as one piece, as the Claims Court did, the Offer's reference to "all contract rights . . . in security instruments" does not include the parties' prior accrued claims.  That is, even construing the Offer as transferring all rights in the loan agreement, promissory note, and mortgage to the Government does not automatically include an assignment of Appellants' accrued breach of contract claims stemming from those rights under *Ginsberg* and *Dominion*. The parties, moreover, defined the three documents collectively as the "loan obligation" and chose not to use that language in the Offer.  It is, therefore, unclear that the parties even intended the Offer to encompass all rights in the three agreements by only referencing "security instruments," which the Government concedes refers only to the mortgage, not the promissory note encompassing the prepayment right. Accordingly, under our precedent, the express language of the Offer does not encompass an assignment of Appellants' prior accrued breach of contract claims.

Finally, contrary to the Government's arguments, the circumstances surrounding the Offer do not establish an implied assignment of prior accrued claims.  Rather, drawing all inferences in favor of Appellants as the nonmovant, the surrounding circumstances show that Appellants intended to prepay the debt and recover their properties in 2008 but, at least based in part on the statutory requirements preventing prepayment, suffered three additional years of reduced housing rates and insufficient funds, ultimately forcing them to offer their deeds in lieu of foreclosure.  While these circumstances support a finding that Appellants sought to exit the § 515 program, they do not

demonstrate that Appellants or the Government under-stood or intended the Offer to include Appellants' prior accrued claims.

And, the Government has not pointed to a single reference to the contrary.  In fact, the Government conceded during oral argument that all the Offer-related documents in the record deal with conveying the property or extinguishing the loan and nothing "suggested that there was any interest, concern, waiver, release, or anything of that sort with respect to any sort of an accrued cause of action," nor is there anything in the record that "suggests or implies that anybody was even thinking about conveying an implied cause of action."  Oral Argument at 17:05, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2 018-1926.mp3.

Accordingly, because Appellants did not expressly or impliedly assign the Government their accrued claims for breach of contract based on the prepayment right, Appellants retain the legal right to pursue those claims and have established standing. We, therefore, reverse the Claims Court's decision that Appellants lack standing and remand for the court to consider the merits of that claim.

## B.  Takings Claim

Appellants additionally argue that the Claims Court erroneously dismissed their alternative Fifth Amendment takings claim.  Appellants base their takings claim on two theories: (1) "the repudiation of the prepayment right itself constituted a taking of a contract right;" and (2) "the regulatory burden placed on the properties as a result of [ELHIPA] constituted a taking of real property."  Appellant Br. 39.

Regarding the first theory, Appellants argue that the Claims Court's denial "is intrinsically tied to its holding regarding the Appellants' breach of contract claims" and, because the Offer "cannot reasonably be interpreted as

assigning the Government each Partnership's prepayment right," we should reverse the Claims Court's decision. *Id.* at 39–40. Regarding the second theory, Appellants argue that the Claims Court "erroneously conflate[d] the taking of real property with the taking of a contract right." *Id.* at 42. Appellants contend that they have property rights independent from their contracts with the Government and that, through the enactment of ELIHPA, the Government "imposed significant restrictions on each owner's property for its entire useful life." *Id.* at 40. According to Appellants, these restrictions constitute a taking because they interfered with Appellants' property rights and investment-backed expectations and required Appellants "to charge restricted rents and house low-income tenants for an additional un-bargained-for period of thirty years." *Id.* at 41. We uphold the Claims Court's decision under the first theory but agree with Appellants as to the latter.

Under the Fifth Amendment, no "private property [shall] be taken for public use, without just compensation." U.S. Const. amend. V. Whether a regulatory taking has occurred involves a "two-tiered" inquiry, under which the court must determine: (1) "the nature of the interest allegedly taken to determine whether a compensable property interest exists;" and (2) "whether the interest allegedly taken constitutes a compensable taking of that interest for a public purpose." *Chancellor Manor v. United States*, 331 F.3d 891, 901–02 (Fed. Cir. 2003).

Here, the Claims Court properly dismissed Appellants' first, contract-based theory. We have explained that, when entering contracts, "'the Government acts in its commercial or proprietary capacity . . . , rather than its sovereign capacity' and therefore the 'remedies arise from the contracts themselves, rather than from the constitutional protection of private property rights.'" *Piszel v. United States,* 833 F.3d 1366, 1376 (Fed. Cir. 2016) (quoting *Hughes Commc'ns Galaxy, Inc. v. United States,* 271 F.3d 1060, 1070 (Fed. Cir. 2001)).

Even assuming the Government was acting in its sovereign capacity, "to effect a taking of a contract right when performance has been prevented, the government must substantially take away the right to damages in the event of a breach." *Id.* at 1377 (citing *Castle v. United States*, 301 F.3d 1328, 1342 (Fed. Cir. 2002)). Aside from the arguments it makes in this proceeding, which we have rejected, the Government has done nothing to try to prevent Appellants from seeking damages. Rather, the Government conceded that Appellants could have brought a breach of contract claim at the time of conveying their deeds in lieu of foreclosure. Government Br. 36–37. Accordingly, Appellants cannot succeed on a takings theory premised on a breach of their prepayment right.

But Appellants can succeed under their second, property-based theory. This theory is premised on Appellants' real property interests in the land and buildings—interests they retained prior to entering the § 515 contracts with the Government. *See Cienega*, 331 F.3d at 1328 ("[A]s title-holders to land on which the apartment buildings were erected, the plaintiffs had fee simple ownership."); *Chancellor Manor*, 331 F.3d at 903. For example, due to their status as titleholders, Appellants had "inherent rights to rent [their] land at any price [they] can command." *Cienega*, at 1329. And, we have explained that when property owners do not convey any interest in their land to the Government but, rather, simply contract with the Government not to assert rights they otherwise could have, "[t]he owners are not somehow deprived of their Fifth Amendment rights merely because they temporarily relinquished some of their rights of fee simple ownership." *Id.* The owners' retained property rights, rather, "put them well within the categories shown by precedent to invoke the Takings Cause of the Fifth Amendment." *Id.*

Here, simply because Appellants contracted with the Government to abide by the § 515 program does not deprive them of their Fifth Amendment rights. That is, Appellants

had valid *property* rights in the land at the time of the alleged taking. And, Appellants have properly asserted a regulatory taking claim based on the enactment of ELIHPA and HCDA. According to Appellants, the enactment of those statutes imposed burdens on their property interest by, for example, prohibiting prepayment absent HUD approval. Contrary to the Claims Courts' determination that this theory was "tied to the breach of the contractual prepayment right," Appellants' claim is based on the fact that they "agreed to be subject to a temporal moratorium on their right to exclusive possession" but, under ELIHPA and HCDA, were subject to "additional and continued limitation[s] on [their] ability to unfettered use of the property." *Chancellor Manor*, 331 F.3d at 903.

Having established that Appellants have presented a proper alternative takings claim based on the allegedly diminished value of their real property, the Claims Court must consider in the first instance whether such a claim is compensable. *See Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978). Accordingly, we affirm-in-part and vacate and remand-in-part the Claims Court's decision as to the takings claim.

## III. CONCLUSION

For the foregoing reasons, we: (1) reverse the Claims Court's decision as to lack of standing on the contract claim and remand for the court to consider the merits thereof; and (2) affirm-in-part and vacate and remand-in-part the Claims Court's decision as to the takings claim.

**REVERSED-IN-PART, AFFIRMED-IN-PART, VACATED-IN-PART, AND REMANDED**

COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

---

**CALLAWAY MANOR APARTMENTS, LTD., FOX GARDEN APARTMENTS, LTD., FOX MANOR APARTMENTS, LTD., LAKE GARDEN APARTMENTS, LTD.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1926

---

Appeal from the United States Court of Federal Claims in Nos. 1:14-cv-00332-EGB, 1:14-cv-00333-EGB, 1:14-cv-00334-EGB, 1:14-cv-00335-EGB, Senior Judge Eric G. Bruggink.

---

HUGHES, *Circuit Judge,* concurring-in-part and dissenting-in-part.

I would affirm the decision of the Court of Federal Claims. As such, I respectfully dissent-in-part.